GLENDA S. ROCKWOOD, Plaintiff-Appellant, v. RAGHU R. SINGH, Defendant-Appellee.

First District (1st Division)   No. 1—92—1905

Opinion filed December 13, 1993.

Michael H. Postilion, Ltd., and Theodore S. Ashbell, both of Chicago, for appellant.

Williams & Montgomery, Ltd., of Chicago (Anthony J. Kiselis and Manya A. Pastalan, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Glenda Rockwood, brought a medical malpractice action against defendant, Raghu Singh, M.D., following spinal surgery performed on her by defendant on January 25, 1983. A jury found in favor of defendant, and plaintiff now appeals.

Plaintiff was admitted into St. James Hospital on January 16, 1983, by her physician, Dr. Irving Feinberg, after complaining of low neck and back pain. Plaintiff had experienced occasional pain in her left arm accompanied by a tingling sensation in her left hand. She was asymptomatic on her right side.

Eventually, Dr. Feinberg referred plaintiff to defendant, a neurosurgeon. Defendant ordered various medical tests and X rays for plaintiff and diagnosed her condition as "spondylosis"—the result of a degenerative disc disease. Defendant arrived at this diagnosis after reading X rays which revealed "bony spur formations" at the openings for the nerve roots at the affected cervical vertebrae. Defendant believed that the spurs were the cause of plaintiff's symptoms, despite the presence of similar spurs on the right side of plaintiff's vertebrae which were not causing similar symptoms. Based upon his diagnosis, defendant recommended spinal surgery.

During the surgery, known as a "discectomy," defendant chose to operate on the right side of plaintiff's cervical spine in addition to the left side based on his readings of the X rays and myelograms.[1] Contrary to the hospital radiologist, defendant believed the myelograms were "abnormal" and that the bony spurs were located on both sides of the plaintiff's spine. Defendant used various instruments to clear the affected areas of the bony spurs.

Following the surgery, plaintiff awoke with pain in both her hands, particularly in her middle and ring fingers. A recovery room nurse informed defendant of plaintiff's post-operative symptoms. In response, defendant increased plaintiff's pain medication. Plaintiff continued to experience pain in her hands in addition to numbness and tingling in her right leg. These symptoms persisted even after plaintiff's release from the hospital. She felt no sensation on her right side, although her left side was sensitive to touch.

Plaintiff testified that the numbness on the right side of her body and the tingling in her right leg have continued since the operation. In addition, she experiences frequent burning sensations to that side of her body. Plaintiff still feels pain in her hands, and she is unable to wash dishes or make the bed. Plaintiff continued to see defendant following her discharge from the hospital. Although she complained about the pain, defendant never examined her again. Defendant ordered various tests for plaintiff in order to determine the cause of the symptoms, but never conducted a complete neurological examination upon her. Eight months after the operation, plaintiff sought

---

[1] A myelogram is similar to an X ray; however, an ink dye is injected into the patient's spine, allowing the physician to see the dye in the X ray.

additional medical opinions. Ultimately, her symptoms were diagnosed as an injury to the left spinothalamic tract.

Plaintiff's medical expert, Dr. Nicholas Wetzel, testified that plaintiff's injury took place in the area of the spinal cord where defendant had performed his surgery. The injury to the nerve roots at both sides of the spinal cord in the neck could have been caused by either a contusion to the spinal cord or by rough handling of the radicular arteries during the surgery. Either could have been caused by defendant "having gone too far laterally" during the course of the operation. Both actions are deviations from the standard of care. Dr. Wetzel testified that operating on the symptom-free right side of plaintiff's spine also constituted a deviation from the standard of care. Plaintiff's injuries are permanent.

Defendant's medical expert, Dr. Sheldon Lazar, testified that the surgery on plaintiff's right side of her spine could have been medically justified because it was intended to prevent future surgery which might have been necessitated by future pain in the nerve roots. In Dr. Lazar's opinion, plaintiff's injuries were attributed to clotting of the anterior spinal artery which was not the result of malpractice.

Defendant's second expert, Dr. Lawrence Ferguson, said the cause of plaintiff's injury was the interruption of the blood supply to the spinal cord. He also admitted that another possible cause of the injury was a contusion to the spinal cord. These can be caused by using the surgical instruments too far laterally in the spine. Also, Dr. Ferguson cited a surgeon's failure to "clean out" all the disc material from the spine as a cause for this type of injury.

■ Plaintiff first argues that the circuit court erred in barring her from making any references to defendant's failure to become a "board certified" neurosurgeon. Although plaintiff was barred from referring to this fact, we note that defendant admitted to the jury that he was not board certified and that plaintiff's counsel made reference to that fact during both opening and closing arguments.

Generally, when a physician sued for malpractice testifies as an expert, evidence as to his age, practice, and like matters relating to his qualifications as an expert is admissible. (*McCray v. Shams* (1992), 224 Ill. App. 3d 999, 587 N.E.2d 66, *appeal denied* (1992), 145 Ill. 2d 635, 596 N.E.2d 630.) In such cases, the failure to pass board-certification examinations is relevant and admissible.

In *McCray*, the parties did not dispute that the defendant doctor testified as an expert. In fact, the court noted that his testimony was consistent with that usually given by such witnesses. Here, however, defendant did not testify in such a manner. Our review of his testimony shows that, although his practice was limited to neurosur-

gery, he did not provide to the jury information such as routine procedures in the operating room and opinions to a reasonable degree of medical certainty as to plaintiff's condition and subsequent injuries. Defendant's testimony was not used to show the standards of medical care associated with such surgery but, rather, was used to relate to the jury what occurred before, during, and after the surgery. For these reasons, the circuit court correctly barred reference to defendant's board-certification status.

█ Plaintiff next asserts that during closing argument defense counsel mischaracterized the evidence by repeatedly suggesting to the jury that defendant was eminently qualified to perform the surgery because he received his training from two experts in the field of neurosurgery. Defendant asserts that the argument was proper as it was based upon evidence adduced during testimony.

During the course of the trial, the various experts for both sides identified Dr. Tew and Dr. Mayfield as recognized authorities in the field of neurosurgery and referred to works published by them during their testimony. During his testimony as an adverse witness, defendant stated that he had trained under Drs. Tew and Mayfield at Good Samaritan Hospital in Cincinnati from 1971 until 1974 and that he completed one year of residency at the hospital in 1975. At that time, he moved to Chicago and began a residency at the Cook County Hospital. Plaintiff's counsel failed to elicit any further elaboration on this training.

The scope and character of closing argument are left to the discretion of the trial judge, who enjoys the best position to view the demeanor of counsel and the atmosphere of the trial. (*Mohler v. Blanchette* (1982), 106 Ill. App. 3d 545, 435 N.E.2d 1161.) Accordingly, determinations regarding closing arguments will not be reversed absent an abuse of discretion. *Dotson v. Sears, Roebuck & Co.* (1987), 157 Ill. App. 3d 1036, 510 N.E.2d 1208, *appeal denied* (1987), 116 Ill. 2d 552, 515 N.E.2d 105.

Generally, counsel properly may draw inferences from the evidence in closing argument. (*Champion v. Knasiak* (1974), 25 Ill. App. 3d 192, 323 N.E.2d 62.) Here, as we have noted above, various witnesses identified Drs. Tew and Mayfield as experts in the field. Moreover, the jury heard that defendant had spent three years in training under these men. Plaintiff did not, at any time during the trial, attempt to impeach or to clarify the matter. Therefore, we consider defense counsel's argument proper. Accordingly, the circuit court did not err in this matter.

█ Plaintiff's next argument focuses upon the following comments made during defense counsel's closing argument:

"[Defense counsel]: I submit that Plaintiff's figures are extremely high. They are extremely high in terms of what he is suggesting. This is after all, real money. This is whether it comes from whoever. This is real money, whether it comes from Dr. Singh or whether it comes from your pockets. These are real figures.

[Plaintiff's counsel]: If the Court, please. I object to that comment.

THE COURT: I will permit it to stand.

Plaintiff argues that defense counsel paused after the word "whoever" and that this extended silence was "very meaningful, and was obviously deliberate." In fact, during the hearing on plaintiff's posttrial motion, the trial judge stated for the record: "There was a pause. It was what I would consider a meaningful pause."

Plaintiff first maintains that her right to a fair trial was denied when the circuit court allowed defense counsel to appeal to the jurors' passion and self-interest. She does so by analogizing the remarks at issue here with cases in which reference was made to other claims asserted against a defendant and to the existence of insurance.

Generally, our courts have held that it is improper to suggest to the jury that an insurance company or other third party would be liable for any judgment rendered against a defendant. (See *Kavanaugh v. Parret* (1942), 379 Ill. 273, 40 N.E.2d 500; *Reed v. Johnson* (1965), 55 Ill. App. 2d 67, 204 N.E.2d 136.) In these circumstances, we have been concerned about the extremely detrimental impact on defendants resulting from the introduction of this irrelevant information. Typically, it is plaintiff's counsel who injects such comments into the record. Here, however, plaintiff accuses defense counsel of the misconduct, arguing that it was done to "take advantage of the current climate of the so-called malpractice crisis."

Plaintiff cites numerous cases in support of her argument, yet all are distinguishable. For example, in *Kavanaugh v. Parret* (1942), 379 Ill. 273, 40 N.E.2d 500, our supreme court addressed whether it was error to ask prospective jurors if any of them were employees, agents, or were otherwise interested in the named insurer. The court recognized that it was improper to inform a jury, either directly or indirectly, that a defendant is insured against liability on a judgment. that may be entered against him. (*Kavanaugh*, 379 Ill. at 278.) That is so because whether a defendant has someone to help him pay a judgment is irrelevant to the merits of the case. (*Kavanaugh*, 379 Ill. at 278.) In contrast, defense counsel here did not specifically mention insurance nor did he allude to any third party who would be a source of funds. We disagree with plaintiff's characterization that counsel "inferred that the jurors *themselves* would suffer financially if they

returned a verdict for plaintiff." Taken in its full context, defense counsel's statement could be better described as a plea for the jury to use reason with regard to assessing damages relating to the plaintiff's future pain and suffering. Appealing to the jurors' reasonableness is hardly novel. Indeed, juries are routinely instructed on this very point. See Illinois Pattern Jury Instructions, Civil, No. 30.01 (3d ed. 1992) ("you must then fix the amount of money which will reasonably and fairly compensate him").

Plaintiff also relies upon *Panelle v. Chicago Transit Authority* (1964), 31 Ill. 2d 560, 202 N.E.2d 484, in which the circuit court granted plaintiff a new trial after defense counsel argued to the jury that "there isn't enough money collected in a year that we would have to pay out in claims in a month." (*Panelle*, 31 Ill. 2d at 561.) The appellate court reversed the ruling, but the supreme court disagreed, holding that nothing in the evidence or in plaintiff's argument called for a discussion of other claims asserted against the defendant or the financial ability of the defendant to pay those claims. Counsel's argument "gave rise to inferences running beyond the merits of the plaintiff's claim as shown by the evidence." (*Panelle*, 31 Ill. 2d at 561.) Again, the complained-of remarks here simply do not rise to the same level because counsel did not mention any other claims against defendant or his ability (or lack thereof) to pay such claims.

Plaintiff further intimates that counsel's remarks evince that defendant had no personal interest in the amount of the verdict and cites *Reed v. Johnson* (1965), 55 Ill. App. 2d 67, 204 N.E.2d 136, for support. Again, this case does little to advance her position. In *Reed*, a steelworker fell from a scaffold. He then sued under the Scaffold Act (Ill. Rev. Stat. 1961, ch. 48, par. 60 *et seq.*). The plaintiff's attorney in closing argument stated:

> "You folks can bring in anything from fifty to one hundred thousand dollars, which is the amount of the ad damnum, which is the right amount here and we are not going to have any personal concern, and the Johnson Bros. don't. There is nothing personal." (*Reed*, 55 Ill. App. 2d at 76.)

The appellate court reversed the judgment in favor of the plaintiff because the court believed that counsel clearly and deliberately implied the existence of insurance. (*Reed*, 55 Ill. App. 2d at 76.) The comments here are not the same because there was no allusion to any third party who might bear the cost of the judgment.

Each of the remarks challenged in the cases discussed above left no doubt that someone other than the defendant would have to bear the burden of the verdict. The remarks complained of here do not

share that characteristic, and we cannot be as certain as plaintiff is that they constituted a reference to a "so-called malpractice crisis." For these reasons, the trial judge did not abuse his discretion in permitting the remark to stand.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.