FOURTH DIVISION
October 12,

No. 1-04-2979

| | | |
|---|---|---|
| MARK JONES, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| OPHELIA RALLOS, | ) | Honorable |
| | ) | Sharon Johnson Coleman |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Ophelia Rallos, M.D., was found liable for medical malpractice with regard to care rendered to plaintiff Mark Jones connected to an apparently false diagnosis that Jones tested positive for the human immunodeficiency virus (HIV). The jury awarded plaintiff damages in the amount of $350,000 and the circuit court denied defendant's posttrial motion. Defendant now appeals.

On appeal, defendant contends that the circuit court erred in denying her motion for a directed verdict where plaintiff was unable to establish the burden of proof on the issue of proximate cause, and in barring evidence of plaintiff's failure to mitigate damages and refusing jury instructions on mitigation of damages. Defendant also

No. 1-04-2979

contends that the circuit court erred in various evidentiary rulings, including denying

plaintiff's motion to bar questions relating to her failing the board certification

examination and limiting evidence of plaintiff's criminal behavior.  For the following

reasons, we reverse and remand this case for a new trial.

## I. BACKGROUND

The record shows that in 1992, Dr. Rallos, a specialist in internal medicine, was

employed by Family Health Specialists and had admitting privileges at Rush

Presbyterian St. Luke's Hospital.  In July 1992, plaintiff saw Dr. Rallos for a nonhealing

ulcer in his mouth and a history of genital warts.  Dr. Rallos ordered a syphilis test and

referred plaintiff to an oral surgeon.  On August 25, 1992, plaintiff returned to Dr. Rallos

with symptoms of "wooziness" and a sore on his penis with penile discharge.  Dr. Rallos

ordered a complete examination for sexually transmitted diseases, including HIV.

HIV antibody testing was performed by Damon Labs, which forwarded its report

to Dr. Rallos.  The report contained an HIV ELISA screening test that showed a positive

for HIV antibodies, which was verified by repeat analysis.  The report also contained the

results of a confirmatory test called the Western Blot Essay.  The lab reported an

"indeterminate" result on this test and provided the following instructions for interpreting

the results of the essay:

"O =   NO BAND DEMONSTRATED

0.5 =  VERY WEAK BAND PRESENT

1 =    WEAKLY POSITIVE

2 =    MODERATELY POSITIVE

No. 1-04-2979

  3 = STRONGLY POSITIVE

    ***

  POSITIVE:  THE PRESENCE OF ANY TWO OR MORE OF THE

      FOLLOWING BANDS WITH AN INTENSITY > 0.5,

      P24, gp 41, AND gp 120/160.

  NEGATIVE:  NO BANDS DEMONSTRATED.

  INDETERMINATE: VIRAL BANDS ARE PRESENT BUT CRITERIA FOR

      POSITIVE RESULTS ARE NOT MET.  A FOLLOW-UP

      SPECIMEN WILL BE REQUIRED WITHIN 6 MONTHS."

Dr. Rallos noted that the scores reported on the Western Blot Essay found bands at

P24 and gp 160 with an intensity of 1.

  Damon Labs also performed a recombinant DNA test, which reported a negative

result.  Dr. Rallos had not heard of this test.  The lab documentation stated the

following:

  "THE RECOMBINANT DNA ASSAY PROVIDES THE DEFINITIVE

  DIAGNOSIS FOR THE PRESENCE OR ABSENCE OF HIV ANTIBODIES

  TO THE ENVELOPE ANTIGENS.  ALL INDETERMINATE WESTERN

  BLOT RESULTS WILL AUTOMATICALLY BE REFLEXED TO THE

  RECOMBINANT DNA ASSAY.  THESE CRITERIA HAVE BEEN

  DEVELOPED BY WALTER REED ARMY INSTITUTE OF RESEARCH

  AND ARE BASED ON OVER 50,000 WESTERN BLOT

  DETERMINATIONS CONDUCTED BY DAMON CLINICAL

No. 1-04-2979

LABORATORIES UNDER CONTRACT WITH THE U.S. ARMY."

On September 15, 1992, Dr. Rallos told plaintiff that he had tested positive for HIV. Dr. Rallos diagnosed plaintiff with HIV based on the results of the ELISA screening test and the Western Blot Essay. Dr. Rallos made recommendations for further care and counseling and ordered baseline tests to measure plaintiff's general health. Dr. Rallos testified that plaintiff was quiet and receptive at the time. Dr. Rallos did not restrict any of plaintiff's activities, except for sexual contacts.

Thereafter, Dr. Rallos followed plaintiff quarterly to monitor his emotional well-being and CD4 count. Dr. Rallos testified that both factors are important. The CD4 count is important because a number below 500 indicates that a patient is deteriorating. If a patient remains largely asymptomatic and the CD4 count is above 500, monitoring should be sufficient. If the CD4 count falls below 500, the patient should be referred to an infectious diseases specialist.

Dr. Rallos testified that in October 1992, plaintiff reported that he was not depressed and that plaintiff had a CD4 count of 955. Dr. Rallos followed up with plaintiff again on December 22, 1992, after plaintiff dislocated his shoulder playing football. Dr. Rallos testified that plaintiff denied being depressed at that time and had a CD4 count of 965. Dr. Rallos referred plaintiff to an orthopedist. Dr. Rallos testified that she also referred plaintiff to an infectious diseases specialist at Rush Presbyterian St. Luke's Hospital for a second opinion because she did not have a great deal of experience with HIV patients. Defendant testified that she provided the address and telephone number for the infectious diseases specialist on the referral form. The referral was good until

January 22, 1993. Dr. Rallos testified that she gave the referral form to a nurse and did not know whether the nurse gave plaintiff the form.

Dr. Rallos knew that plaintiff followed through on the referral to the orthopedist because she received a letter confirming it. Dr. Rallos assumed that plaintiff followed through on the referral to the infectious diseases specialist, but did not ask plaintiff about it. Dr. Rallos did not hear from the consulting specialist.

Dr. Rallos saw plaintiff again on March 30, 1993, and observed no change in his condition. Dr. Rallos testified that during a July 27, 1993 appointment, plaintiff was upset due to his mother's death, but did not express any emotional difficulty regarding the HIV diagnosis.

Dr. Rallos' notes show that on November 9, 1993, plaintiff was doing well clinically, but that his CD4 count had fallen to 344. Dr. Rallos then referred plaintiff to Dr. Russell Petrak, an infectious diseases specialist, for drug therapy "ASAP." This was the last time that Dr. Rallos treated plaintiff.

Dr. Petrak, who first saw plaintiff on November 15, 1993, testified that he also diagnosed plaintiff as HIV positive. Dr. Petrak was unfamiliar with the recombinant DNA test. Dr. Petrak prescribed AZT and told plaintiff that he would be retested at some point. At later appointments, Dr. Petrak never found plaintiff to be depressed or experiencing emotional problems, though he noted on April 25, 1994, that plaintiff was "stressed out mentally" because his daily and recreational activities were decreased after breaking an arm playing basketball.

Dr. Petrak testified that his notes for May 2, 1994, showed a CD4 count of 918.

Dr. Petrak then questioned the prior diagnosis, given the sudden rise in the CD4 count. Dr. Petrak sent plaintiff for follow-up testing, which showed a negative ELISA test and an indeterminate Western Blot Essay. Dr. Petrak believed that the 1992 test was a false positive. Dr. Petrak told plaintiff that the serology showed that he was not HIV positive and discontinued the AZT treatment. Dr. Petrak referred plaintiff back to Dr. Rallos and recommended a follow-up test in November 1994. Dr. Petrak also wrote to Dr. Rallos regarding plaintiff's case. Plaintiff never received follow-up testing from Dr. Rallos or Dr. Petrak.

Dr. Jay Matthew Ehrlich, an associate medical director in clinical safety for Abbott Laboratories, testified that he worked at Family Health Specialists from 1993 to 1996 as a medical resident. Dr. Ehrlich performed a physical examination of plaintiff on October 19, 1994. Dr. Ehrlich did not review plaintiff's entire chart at that time. Dr. Ehrlich opined that the original HIV test was indeterminate, based on the Western Blot Essay result as reported by Damon Labs. Dr. Ehrlich also testified that he would defer to a specialist in interpreting the bands on the Western Blot Essay.

Dr. Ehrlich opined that Dr. Rallos deviated from the standard of care by informing plaintiff that he was HIV positive instead of indeterminate, though plaintiff would have been instructed to behave as though he had HIV and to be retested in six months. Dr. Ehrlich also testified that the standard of care required defendant to call the lab to discuss the results or to refer plaintiff to an infectious diseases specialist.

The circuit court sustained an objection to Dr. Ehrlich's opinion that plaintiff never got the referral slip or knew that he should go to Rush Presbyterian St. Luke's Hospital.

Dr. Ehrlich did not work at Family Health Specialists in December 1992, when Dr. Rallos said that she referred plaintiff to Rush Hospital, but testified that he was familiar with the office policies from 1993 to 1996 and saw similar paperwork from 1992. Dr. Ehrlich testified that a doctor would fill out basic information on a referral form, but that someone else would ensure the referral was within the HMO network and make an appointment for the patient. Dr. Ehrlich testified that the referral slip at issue contained no information about an appointment, suggesting that the paperwork was not processed.

Plaintiff's witness, Dr. Roberta Luskin-Hawk, who is board-certified in infectious diseases and internal medicine, with expertise in HIV infection cases, testified about the testing procedures for detecting HIV. Dr. Luskin-Hawk testified that while the initial Western Blot Essay was reported as indeterminate, it was possible to look at the results and believe that the result was positive. Dr. Luskin-Hawk testified that Damon Labs had a standard that any time a Western Blot Essay was indeterminate, a PCR test or a recombinant DNA test would be performed to attempt to clarify the result. Dr. Luskin-Hawk opined that Dr. Rallos could have met the relevant standard of care had she either called the laboratory for clarification of the test results or referred plaintiff to a specialist. Dr. Luskin-Hawk further testified that if plaintiff had been retested within six months, doctors would have had a clearer indication that plaintiff was not HIV positive at an earlier time.

Dr. Scott Kale provided similar testimony about the standard of care. Dr. Kale also testified over objection regarding the recombinant DNA test and how that test

explains the apparent contradiction between the lab's conclusion that the Western Blot Essay result was indeterminate and the presence of two bands with a strength of 1 in that test.

Dr. David Simon, an infectious diseases specialist with expertise in HIV diagnosis and treatment, testified for the defense that while he personally would have contacted the laboratory about the test results, Dr. Rallos met the applicable standard of care. Dr. Simon was cross-examined on his prior deposition testimony that the applicable standard of care required defendant to find out the reason the laboratory reported an indeterminate result.

Defense witness Dr. Patrick Sullivan, who is board-certified in internal medicine, testified that Dr. Rallos complied with the applicable standard of care. Dr. Sullivan opined that Dr. Rallos was not required to simply accept the indeterminate laboratory test result, particularly where plaintiff was at risk for HIV infection based on the clinical, historical and physical examination criteria. Dr. Sullivan opined that Dr. Rallos was not required to immediately refer plaintiff to a specialist because the referral doctor was unlikely to have done anything in the short term other than monitor plaintiff's CD4 count. Dr. Sullivan further opined that it is better for a patient to hear a positive diagnosis than an indeterminate one, as the patient does not suffer the anguish of uncertainty.

Plaintiff testified that he was 23 years old when he was diagnosed with HIV. Plaintiff testified that he was raised in the Englewood neighborhood of Chicago, which he described as a tough area where gang violence, drugs and prostitution are prevalent. Plaintiff testified that he stayed away from these criminal elements because he wanted

something better for himself. Plaintiff testified that he lettered in football and basketball in high school and was an all-area, tournament MVP.

Plaintiff testified that he was the first individual in his family to attend college. Plaintiff was recruited to play basketball at the University of Wisconsin, but did not play there because he was not offered a full scholarship. Plaintiff first attended Southeastern Illinois in Harrisburg, then attended Park College in Parkville, Missouri, where he was team MVP and most inspirational player. Plaintiff worked with a support group for troubled kids. Plaintiff had a summer job as a campus security guard. Plaintiff graduated in 1991 with a B+ average, earning a degree in criminology and probation.

Plaintiff testified that he was laid off from his job with a pipeline company in 1991, because he did not want to relocate. Plaintiff was hired as a security officer at the University of Chicago in April 1992. Five months later, on the day he had blood drawn for the initial HIV test, plaintiff was arrested by the Chicago police department. Plaintiff later pleaded guilty to unlawful use of a weapon. Plaintiff was placed on supervision for one year and subsequently had the arrest expunged from his record. Plaintiff was fired from the security job as a result of his arrest, but he testified that he was not bothered by his termination and began to look for another job.

Plaintiff testified that after he was diagnosed with HIV, he considered committing suicide and feared having his body deteriorate and becoming a social outcast. Plaintiff testified that within weeks, he began associating with gang members, carrying a gun, selling marijuana and gambling. He was involved in drive-by shootings and was named the treasurer of his gang. Plaintiff also testified that he did not recall Dr. Rallos making

a referral in December 1992 to Rush Hospital to be seen by an infectious diseases specialist, but that he went somewhere for blood work. Plaintiff testified that after the HIV-negative diagnosis, he disassociated himself from the gang and obtained a number of security jobs with the Chicago Public Schools, the Stanley Smith firm and Jewel/Osco stores.

Defendant sought to introduce evidence that plaintiff was arrested in 1990 for obstructing traffic during the sale of narcotics; that plaintiff was arrested and fired from his job, one month before the diagnosis in 1992, due to his involvement in an armed robbery with a gang member and his status as a convicted felon; and that plaintiff misstated his employment status to the sentencing judge when he pleaded guilty to the unlawful use of a weapon. Defendant was allowed to present only evidence that plaintiff was fired in connection with the plea to the unlawful use of a weapon.

Dr. Carl Bell, a board-certified psychiatric neurologist, opined that the HIV-positive diagnosis caused a major traumatic stressor to plaintiff. Dr. Bell testified that in 1992, it was a de facto death sentence that could cause depression and a shortened sense of one's future.

On cross-examination, defendant questioned Dr. Bell regarding a "synopsis of care by defendant" prepared by plaintiff's counsel. The synopsis included a statement that on December 22, 1992, plaintiff was referred to an orthopedist and given a referral slip to see an infectious diseases specialist at Rush Presbyterian St. Luke's Hospital. The synopsis stated that plaintiff followed up with the orthopedist, but not with the infectious disease consult. The synopsis further stated that plaintiff had commented

No. 1-04-2979

that Rush Presbyterian St. Luke's Hospital was too far away and that he was humiliated by the treatment he received by healthcare providers when they found out that he was HIV positive.

At the conclusion of the trial, the jury returned a verdict in favor of plaintiff and answered special interrogatories finding that the proximate cause of plaintiff's injuries was not defendant's initial misdiagnosis, but her failure to perform further investigation into plaintiff's medical condition following the HIV test.  The circuit court entered judgment on the verdict.  Defendant filed a posttrial motion, which the circuit court denied.  Defendant now appeals.

II. ANALYSIS

A. Cross-examination of Defendant

Defendant contends that the circuit court erred in failing to bar questions about defendant failing the board-certification examination for internal medicine.  When a physician sued for malpractice testifies as an expert, evidence as to her age, practice and like matters going to her qualifications as an expert is admissible.  McCray v. Shams, 224 Ill. App. 3d 999, 1002 (1992).  In such cases, evidence of the physician's failure to pass board certification examinations is relevant and admissible.  Rockwood v. Singh, 258 Ill. App. 3d 555, 557 (1993).  In contrast, where the defendant's testimony is not used to show the standards of medical care, but is used to relate to the jury what occurred before, during, and after treatment, reference to defendant's board-certification status is properly barred.  Rockwood, 258 Ill. App. 3d at 558.

No. 1-04-2979

Here, the record shows that over defense counsel's objection, plaintiff was allowed to question defendant regarding her failure to pass board-certification examinations. Defendant testified that she studied for the board-certification examination in both 1998 and 1999, but did not pass the examination in those years. Defendant testified that she did not plan on taking the board-certification examination in the future. While plaintiff correctly notes that defendant disclosed this information herself, in pretrial answers to interrogatories, as a controlled expert witness who <u>may</u> testify at trial, the record shows that defendant testified as to her treatment of plaintiff, but not as an expert at trial. Defendant's failure to pass board-certification examinations was therefore not relevant in this case. For this reason, it was reversible error to permit references to defendant's board-certification status. Since other issues raised in this appeal will arise on retrial in this case, we will address them here.

B. Evidence of Plaintiff's Criminal Behavior

Defendant also contends that the circuit court erred in barring evidence of plaintiff's criminal behavior, which defendant argues is relevant to the issues of causation and damages. Defendant sought to introduce evidence that plaintiff was arrested in 1990 for obstructing traffic during the sale of narcotics; was arrested and fired from his job, one month before the diagnosis in 1992, due to his involvement in an armed robbery with a gang member and his status as a convicted felon; and misstated his employment status to the sentencing judge when he pleaded guilty to the unlawful use of a weapon. The circuit court allowed only evidence that plaintiff was fired in

No. 1-04-2979

connection with the plea to the unlawful use of a weapon. In doing so, the circuit court weighed the probative value of the evidence against its prejudicial effect.

Generally, character evidence is inadmissible when a party's character is not in issue. Lebrecht v. Tuli, 130 Ill. App. 3d 457, 473 (1985). Evidence is relevant when it tends to prove a fact in controversy or render a matter in issue more or less probable. Lebrecht, 130 Ill. App. 3d at 473; see also Pluto v. Searle Laboratories, 294 Ill. App. 3d 393, 398 (1998) (lifestyle choices of persons in suspect category were in issue where it was not the intrauterine device manufactured by defendant but the lifestyle choices that placed persons in suspect category at risk for the contraction of sexually transmitted diseases).

Here, plaintiff's character and lifestyle prior to his 1992 HIV diagnosis were in issue where plaintiff argued that his lifestyle changed and that he engaged in criminal activity because of the false HIV diagnosis. Plaintiff testified that prior to the HIV diagnosis, he was not involved with gangs, drugs, or guns and stayed away from the criminal element. Plaintiff testified that following the HIV diagnosis, he began associating with gang members, carrying a gun, selling marijuana and gambling. Plaintiff also became involved in drive-by shootings and was named the treasurer of his gang. The evidence of plaintiff's arrests in 1990 and 1992 relate to plaintiff's character and lifestyle prior to his 1992 HIV diagnosis, which plaintiff placed in issue. Accordingly, the circuit court erred in excluding this evidence.

C. Mitigation of Damages

Defendant further contends that the circuit court erred in several rulings relating

No. 1-04-2979

to defendant's affirmative defense that plaintiff failed to mitigate damages by failing to follow through on defendant's December 22, 1992, referral to an infectious diseases specialist. The record shows that the circuit court granted plaintiff's motion to bar evidence of the defense. The circuit court later granted a directed verdict on the defense and refused to tender a jury instruction on the defense.

Defendant argues that the circuit court improperly barred evidence of her defense because the court failed to distinguish between the concepts of mitigation of damages and contributory negligence. Mitigation of damages is a distinct concept that is separate from contributory negligence. Brady v. McNamara, 311 Ill. App. 3d 542, 547 (1999). Contributory negligence involves circumstances where the plaintiff's negligence is a legally contributing cause of his harm if it is a substantial factor in bringing about his harm. Malanowski v. Jabamoni, 332 Ill. App. 3d 8, 15 (2002). In contrast, the rule of mitigation of damages involves imposing a duty upon the injured party "to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted. [Citation.]" Malanowski, 332 Ill. App. 3d at 15.

In this case, plaintiff filed a pretrial motion in limine which, by its title, sought to "bar any reference to contribution against the plaintiff." However, the substance of plaintiff's motion was directed to defendant's previously filed affirmative defense that plaintiff failed to mitigate damages by not following defendant's referral instruction to an infectious diseases specialist until many months after the referral. Defendant correctly notes that during the hearing on plaintiff's motion, the circuit court also incorrectly referred to contribution. Nonetheless, the record shows that defense counsel corrected

˘14˘

No. 1-04-2979

the court by stating that the motion was directed to mitigation of damages, not contributory negligence. When the circuit court granted plaintiff's motion, defendant moved to reconsider and the circuit court noted that it would take defendant's motion under advisement. The circuit court subsequently allowed its ruling to stand and stated that it would allow defendant to produce evidence "when it comes time to request damages and how long the plaintiff suffered." The circuit court also stated that, "at this point[,] *** [defendant] cannot affirmatively state [plaintiff] had a duty to mitigate his damages from this diagnosis."

A ruling on a motion in limine is a determination addressing an admissibility of evidence issue likely to arise at trial and is subject to reconsideration. Sullivan-Coughlin v. Palos Country Club, Inc., 349 Ill. App. 3d 553, 561 (2004). Whether granted or denied, a motion in limine itself does not preserve the issue for appellate review. Sullivan-Coughlin, 349 Ill. App. 3d at 561. Rather, to preserve an error in the exclusion of evidence, the proponent of the evidence must make an adequate offer of proof in the circuit court and failure to make such offer of proof results in waiver of the issue on appeal. Sullivan-Coughlin, 349 Ill. App. 3d at 561.

Here, the circuit court made the interlocutory nature of its order known to defendant and invited defendant to revisit the issue when damages would be addressed at trial. The record shows that defendant herself testified that she provided plaintiff with a referral on December 22, 1992, to visit an infectious diseases specialist. Defendant also questioned Dr. Kale regarding the "synopsis of care by defendant" prepared by plaintiff's counsel. The synopsis stated that on December 22, 1992, plaintiff was

No. 1-04-2979

referred to an infectious diseases specialist but did not follow up with the referral. Plaintiff did not object to any of this testimony. Defendant has identified no offer of proof as to any additional evidence of her affirmative defense that she was barred from introducing at trial; therefore, the issue is waived.

The issues of whether the circuit court properly directed a verdict on the affirmative defense and barred a jury instruction thereon are different. We apply the de novo standard of review to the circuit court's directed verdict. A motion for a directed verdict should be granted " 'only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.' " Buckholtz v. MacNeal Hospital, 337 Ill. App. 3d 163, 167 (2003), quoting Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510 (1967). A directed verdict is improper where "there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." Maple v. Gustafson, 151 Ill. 2d 445, 454 (1992); Golembiewski v. Hallberg Insurance Agency, Inc., 262 Ill. App. 3d 1082, 1090 (1994).

In this case, after both parties rested their cases, the circuit court granted plaintiff's motion for a directed verdict on defendant's mitigation defense. At trial, defendant testified that she provided two referrals in December 1992 for plaintiff to visit

an orthopedist and an infectious diseases specialist. Defendant testified that she provided the address and telephone number for the infectious diseases specialist on a referral form. Defendant also testified that plaintiff followed through with the referral to the orthopedist. Plaintiff testified that he did not recall receiving a referral to an infectious disease specialist, but he could not say that he did not receive it. On appeal, defendant also points to evidence presented at trial regarding a "synopsis of care by defendant" that was prepared by plaintiff's attorney and Dr. Bell's testimony that the synopsis contained a statement that plaintiff received defendant's referral to the infectious diseases specialist but did not follow through with the referral. The record shows that when defendant cited this testimony in support of her argument in opposition to plaintiff's motion for directed verdict, the circuit court stated that the synopsis should not have been allowed into evidence. The circuit court stated that it would disregard the evidence regarding the synopsis and determined that defendant was not entitled to the affirmative defense.

We do not disagree with the circuit court's ruling rejecting the admissibility of the "synopsis of care by defendant" for purposes of deciding plaintiff's motion for a directed verdict. Rather, we have considered defendant's testimony that she provided referrals for plaintiff to visit an orthopedist and an infectious diseases specialist and that plaintiff followed through with the referral to the orthopedist, coupled with plaintiff's testimony in which he did not deny receiving a referral to visit an infectious diseases specialist. We find that this evidence demonstrates a substantial factual dispute which renders a directed verdict on defendant's mitigation defense improper, as it was a question of fact

No. 1-04-2979

that should have been resolved by the jury in this case.

Our conclusion that a directed verdict was improper in this case also compels us to find that the circuit court erred in denying defendant's request for a jury instruction relating to mitigation of damages. A party has a right to have the jury instructed on her theory of the case if the facts in evidence or a reasonable inference from those facts supports the theory. Tsoukas v. Lapid, 315 Ill. App. 3d 372, 377 (2000). In a medical malpractice case, a mitigation-of-damages instruction is appropriate if a party presents a theory of the case in which the patient's negligence merely follows the physician's malpractice, for example, when a patient fails to participate in prescribed physical therapy. Malanowski, 332 Ill. App. 3d at 15.

At trial, plaintiff's theory of the case was that in September 1992, defendant negligently interpreted test results and informed plaintiff that he was HIV positive; and in May 1994, plaintiff was retested and informed that he was not HIV positive. Defendant's theory of the case was that even if she had been negligent in diagnosing plaintiff as HIV positive, plaintiff still had an obligation to try to mitigate his damages. Defendant argued that plaintiff had a duty to follow through with defendant's referral in December 1992 to visit an infectious diseases specialist, which would have decreased the period of time in which plaintiff suffered from a false-positive test result.

At the jury instructions conference, defendant requested a mitigation-of-damages (Illinois Pattern Jury Instructions, Civil, No. 105.08 (1995)) instruction, which provides:

" A patient must exercise ordinary care to [seek treatment] [follow

reasonable medical (advice) (instructions) ]. A physician is not liable for the consequences of a patient's failure to do so. A patient's failure to use ordinary care in obtaining treatment or in following instructions does not absolve the physician from any damages resulting from the physician's negligence. It only absolves the physician from any damages caused by the patient's failure to exercise ordinary care to [seek treatment] [follow reasonable medical (advice) (instructions) ]."

Defendant's theory of the case supported this mitigation-of-damages instruction. Defendant presented a theory that plaintiff was negligent in not following up on the December 1992 referral following any malpractice on her part. We note that, in return, plaintiff could have argued that defendant should have followed up with him regarding the referral to the infectious diseases specialist.

## D. Recovery of Damages

Lastly, we note that neither party addressed at trial or on appeal whether plaintiff could recover damages in this case without proving physical injury. This appears to be a case of first impression in Illinois. Other courts have allowed recovery of damages for emotional distress as a result of medical negligence in circumstances concerning the misdiagnosis of illness where the misdiagnosis is based on false-positive conclusions on medical tests. However, jurisdictions have differed regarding the type of injury necessary to recover damages. See C. Vento, Physical injury requirement for emotional distress claim based on false positive conclusion on medical test diagnosing disease, 69 A.L.R. 5th 411 (1999).

No. 1-04-2979

Some jurisdictions require a physical injury or physical peril related to the emotional distress for the distress to be compensated. See Kennedy v. University of Cincinnati Hospital, No. 94API09-1333 (Ohio App. 10th Dist.) (March 30, 1995) (affirming damages where false- positive HIV test was the reason for the patient's hysterectomy, which caused physical injury and emotional distress); M.M.H. v. United States, 966 F.2d 285 (7th Cir. 1992) (applying Wisconsin law) (finding that suicide attempt satisfied the physical injury requirement for recovery for emotional distress). The nonexistence of physical injury or physical danger has led some courts to deny emotional distress claims. See Heiner v. Moretuzzo, 73 Ohio St. 3d 80, 652 N.E.2d 664 (1995) (patient could not recover damages for negligent infliction of emotional distress where the misdiagnosis of HIV did not cause actual physical peril); Verinakis v. Medical Profiles, Inc., 987 S.W.2d 90 (Tex. 1998) (life insurance applicant's alleged reaction after receiving false-positive result for HIV, which included anxiety-related sweating spells, depression, withdrawal, insomnia, and bruising and swelling from repeated blood draws for HIV follow-up, did not rise to the level of "serious bodily injury" necessary to support the recovery of mental anguish damages); Griffin v. American Red Cross, Civ. No. 93-5924 (E.D. Pa. November 28, 1994) (applying Pennsylvania law) (Plaintiff failed to allege sufficient physical injury; mistaken diagnosis of HIV was corrected one day later; and Pennsylvania law does not recognize a cause of action for negligent infliction of emotional distress based on a fear of contracting acquired immune deficiency syndrome (AIDS)). Other jurisdictions have taken the position that liability can be

No. 1-04-2979

imposed for negligent infliction of emotional distress without an accompanying physical injury. See Schulman v. Prudential Insurance Co. of America, 640 N.4.5 2d 112, 226 A.D. 2d 164 (1996); Chizmar v. Mackie, 896 P.2d 196 (Alaska 1995); Machesney v. Bruni, 905 F. Supp. 1122 (D.C. 1995); McKone v. Addiss, No. CV94 053 59 64 (Conn. Super. 1995); Bramer v. Dotson, 190 W. Va. 200, 437 S.E.2d 773 (1993).

In Illinois, our supreme court has determined that without proof of actual exposure to HIV, a claim for fear of contracting AIDS is too speculative to be legally cognizable. Majca v. Beekil, 183 Ill. 2d 407 (1998). While our supreme court has required proof of actual exposure to HIV for claims based on a fear of contracting AIDS, we recognize that the present situation differs where plaintiff received an actual, but false, diagnosis of HIV. We also note that some courts in Illinois have required that a plaintiff allege sufficient physical injury in medical malpractice actions for a misdiagnosis or delay in diagnosing certain medical conditions. See Gauthier v. Westfall, 266 Ill. App. 3d 213 (1994) (patient's evidence was insufficient to provide basis upon which jury could conclude that any negligence by physician in failing to earlier diagnose malignancy of patient's breast proximately caused any injury); Perez v. Hartmann, 187 Ill. App. 3d 1098 (1989) (affirming damages for plaintiff where plaintiff alleged that, had physician interpreted his medical test properly, the physician would not have recommended the implantation of a permanent pacemaker, which was subsequently removed).

In the present case, plaintiff alleged that he has "sustained personal injuries, has lost and will in the future lose financial gains and lost earnings which he otherwise would

No. 1-04-2979

have made and acquired, he has sustained pain and suffering which will continue into the future, he has sustained disability and disfigurement which will continue, and he has become liable for medical and hospital care." On remand, the circuit court should address the issue pertaining to whether plaintiff has alleged sufficient damages to permit recovery in this case.

### III. CONCLUSION

For the foregoing reasons, we reverse the jury verdict and remand for a new trial.

Reversed and remanded.

GREIMAN, J., concurs.

CAMPBELL, J., dissents.

JUSTICE CAMPBELL, dissenting:

The majority opinion goes beyond the issues raised by the parties on appeal to suggest not only that the plaintiff wrongfully diagnosed with HIV should recover a lesser award of damages, but also to suggest that he may be entitled to no recovery for the malpractice in this case. As the "Analysis" section of the opinion has four sections, this dissent will adopt the same format.

## I. Cross-examination of Defendant

The majority opinion holds that the trial court committed reversible error by failing to bar questions about defendant failing a board examination. However, plaintiff failed to include the posttrial motion in the record on appeal. Nor did defendant cite where in the transcript the question was asked. Thus, defendant waived the issue.

Waived errors may still be subject to plain error review. Prairie v. Snow Valley Health Resources, Inc., 324 Ill. App. 3d 568, 574 (2001). However, "[p]lain error is a limited and narrow exception to the general waiver rule." In re Detention of Traynoff, 338 Ill. App. 3d 949, 963 (2003). Indeed, relief under the plain error doctrine is "exceedingly rare" in civil cases, limited to cases where the proceedings deprived the appellant of a fair trial and amounted to "an affront to the judicial process." Dowell v. Bitner, 273 Ill. App. 3d 681, 693 (1995). The majority disregards the waiver in this case without mentioning that it is doing so, let alone explaining its reasons for doing so. On the merits, the majority relies upon McCray v. Shams, 224 Ill. App. 3d 999, 1002 (1992), and Rockwood v. Singh, 258 Ill. App. 3d 555, 557 (1993). Neither case found it reversible error to question a defendant physician on board-certification, let alone that

an error on this point is reversible error per se, let alone that it justifies ignoring defendant's waiver.

In this case, plaintiff presented the testimony of numerous experts opining that defendant violated the standard of care. Defendant presented two experts who testified to the contrary, but one of them was forced to admit he gave deposition testimony that the standard of care required defendant to find out why the laboratory reported an indeterminate test result. Given this record, I cannot agree that a question regarding defendant's failure of a board exam deprived her of a fair trial or so undermined the judicial process that this court should ignore her waiver of the issue.

## II. Evidence of Defendant's Criminal Behavior and Character

In dicta, the majority states that the trial court erred in barring evidence of plaintiff's criminal behavior, which the majority states is relevant to the issues of causation and damages. Given the unique circumstances of this case, where plaintiff's claim rests in part on such behavior, I agree that evidence suggesting such behavior predated the misdiagnosis may be relevant.

The record shows, however, that defendant sought to introduce evidence of the 1990 and 1992 arrests and the circumstances surrounding them through the testimony of Lee Caldwell, plaintiff's supervisor at the University of Chicago security job, who investigated the arrest that led to plaintiff being fired from that job. Caldwell learned this information by reviewing police reports and talking to police officers. Generally, police reports are inadmissible; the mere attempt to introduce such an exhibit may be considered reversible error. Cranwill v. Donahue, 132 Ill. App. 3d 873, 874 (1985). The theory behind this line of cases is that arrest or police reports are inadmissible because

the information in the report is generally hearsay or states conclusions. <u>Cranwill</u>, 132 Ill. App. 3d at 874. Testimony from Caldwell, who had no personal knowledge of the information supplied by the police reports or the officers, would have been double hearsay at best. Obviously, on remand, the trial court will be required to follow well-established case law from this court and our supreme court regarding the admissibility of police reports and hearsay.

As for plaintiff's apparent misstatement of his employment status to the sentencing judge when he pleaded guilty to the unlawful use of a weapon, the transcript shows that the trial court carefully analyzed whether such statements should be considered judicial admissions and, if so, whether admitting the evidence would be more prejudicial than probative. The trial court ultimately ruled that the statements should not be deemed a judicial admission. Defendant offered no argument to the contrary; neither does the majority opinion. Thus, the majority forces the trial judge to choose between the clear suggestion in the majority's <u>dicta</u> that the evidence should have been admitted and well-established case law regarding judicial admissions.

### III. Mitigation of Damages

The majority opinion holds that defendant waived the issue of whether the trial court improperly barred evidence of the mitigation defense. I concur, though the majority's application of the waiver rule as to this issue seems unusual, as this issue was much more likely to affect the outcome of the trial than the question of whether the jury should have heard about defendant's lack of board-certification. It is doubly unusual, given that this portion of the majority opinion purports to be advising the parties on issues likely to arise on retrial.

The majority then turns to the trial court's refusal of the jury instruction on the issue.  The majority finds a substantial factual dispute is raised by "defendant's testimony that she provided referrals for plaintiff to visit an orthopedist and an infectious diseases specialist and that plaintiff followed through with the referral to the orthopedist, coupled with plaintiff's testimony in which he did not deny receiving a referral to an infectious diseases specialist."  Slip op. at 16.

However, the record on appeal shows that defendant testified that she provided the address and telephone number for the infectious diseases specialist and gave the referral form to a nurse, not to plaintiff.  Defendant did not know whether the nurse gave the form to plaintiff.  Dr. Jay Matthew Ehrlich, who worked at Family Health Specialists from 1993-96 as a medical resident, testified that he was familiar with the office policies from 1993-96 and saw similar paperwork from 1992.  Dr. Ehrlich testified that a doctor would fill out basic information on a referral form, but that someone else would ensure the referral was within the HMO network and make an appointment for the patient.  Dr. Ehrlich testified that the referral slip at issue contained no information about an appointment.

This testimony--omitted from the majority opinion's analysis of the issue--when combined with plaintiff's testimony that he did not recall getting a referral to an infectious diseases specialist and evidence that plaintiff did follow through with the other referral, does not create a substantial factual dispute.  The burden was on the defendant to show that plaintiff did receive a referral to trigger a duty to mitigate.  Thus, I would have upheld the trial court's ruling.

IV.  Recovery of Damages

The majority opinion notes that the issue of whether plaintiff can recover without proving physical injury was not raised by the parties. Thus, the reader may wonder why the majority has included it in a portion of the opinion ostensibly addressing issues likely to arise on retrial. The issue is likely to arise on retrial <u>only</u> because the majority opinion has stated it <u>should</u> arise at retrial, with disregard for the custom and general function of an appellate court.

The majority opinion proceeds on the notion that this case "appears to be one of first impression in Illinois" (slip op. at 18), followed by a scholarly discussion of the law of other jurisdictions, but ultimately offers no opinion as to how the issue should be resolved. Given how far afield the majority opinion goes on this issue, the lack of follow through is disappointing, so the following is offered for the consideration of the parties and the trial court on remand.

Our supreme court has held that a patient is not required to allege physical injury to recover for negligent infliction of emotional distress arising from alleged medical malpractice. <u>Corgan v. Muehling</u>, 143 Ill.2d 296, 308-12 (1991).[1] Our supreme court

---

[1] Even if someone could creatively fashion an exception to this rule, other jurisdictions have held that if a patient can establish that a misdiagnosis led to the prescription of caustic medication such as Azidothymidine (commonly known as "AZT," which plaintiff in our case was prescribed), and that he suffered bodily injury from that treatment, then he would have met the requirements of the impact rule and would be able to recover for the emotional trauma suffered as a result of that treatment. E.g., <u>R.J. v. Humana of Florida, Inc.</u>, 652 So.2d 360, 364 (Fla.

also has held that "[t]he economic loss doctrine does not bar recovery in tort for the breach of a duty that exists independently of a contract." <u>Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.</u>, 159 Ill. 2d 137, 164 (1994). In this case, plaintiff alleged and proved both emotional distress and economic loss. These factors may suggest why the parties did not litigate the issue.

In sum, the majority opinion inconsistently applies the waiver rule, shifts the burden of proof for the affirmative defense, misreads Illinois case law and the record on appeal, and goes far beyond the issues necessary to decide the appeal. Accordingly, I dissent.

---

1995).