THIRD DIVISION
June 25, 2008

No. 1-04-2979

| | | |
|---|---|---|
| MARK JONES, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| OPHELIA RALLOS, | ) | Honorable |
| | ) | Sharon Johnson Coleman |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Ophelia Rallos, M.D., was found liable for medical malpractice with regard to care rendered to plaintiff Mark Jones connected to an apparently false diagnosis that Jones tested positive for the human immunodeficiency virus (HIV). The jury awarded plaintiff damages in the amount of $350,000 and the circuit court denied defendant's posttrial motion. Defendant then appealed.

On appeal, defendant contended that the circuit court erred in denying her motion for a directed verdict where plaintiff was unable to establish the burden of proof on the issue of proximate cause, and in barring evidence of plaintiff's failure to mitigate damages and refusing

No. 1-04-2979

jury instructions on mitigation of damages. Defendant also contended that the circuit court erred in various evidentiary rulings, including denying plaintiff's motion to bar questions relating to her failing the board certification examination and limiting evidence of plaintiff's criminal behavior.

In a published opinion, a majority of this court reversed and remanded for a new trial. Jones v. Rallos, 373 Ill. App. 3d 439 (2006). In doing so, we held that the trial court committed reversible error in permitting plaintiff to elicit evidence that the defendant physician had failed the board-certification examination for internal medicine. Jones v. Rallos, 373 Ill. App. 3d at 447. We then addressed several issues raised in the appeal which would likely arise on retrial. Justice Campbell filed a dissent. Jones v. Rallos, 373 Ill. App. 3d at 454-57 (Campbell, J., dissenting).

Plaintiff filed a petition for rehearing which was denied. Plaintiff then filed a petition for leave to appeal. While the supreme court denied the petition for leave to appeal, the court also entered the following order:

"In the exercise of this Court's supervisory authority, the Appellate Court, First District, is directed to vacate its judgment in Jones v. Rallos, 373 Ill. App. 3d 439 (2006). The appellate court is directed to reconsider its judgment , with additional analysis of whether any error in the trial court's decision to permit plaintiff-appellee to elicit evidence of defendant-appellant's failure to pass board-certification examinations constitutes no more than harmless, nonreversible error. In light of the appellate court's additional analysis and resolution of this issue, the appellate court is directed to consider whether defendant-appellant is entitled to

No. 1-04-2979

relief on any of the other issues raised in the appeal." Jones v. Rallos, 225 Ill. 2d 636 (2007).

Pursuant to the supervisory order, we vacated our previous judgment in this case. In reconsidering our judgment, for the reasons explained herein, we now affirm the jury's verdict.

I. BACKGROUND

The record shows that in 1992, Dr. Rallos, a specialist in internal medicine, was employed by Family Health Specialists and had admitting privileges at Rush Presbyterian St. Luke's Hospital. In July 1992, plaintiff saw Dr. Rallos for a nonhealing ulcer in his mouth and a history of genital warts. Dr. Rallos ordered a syphilis test and referred plaintiff to an oral surgeon. On August 25, 1992, plaintiff returned to Dr. Rallos with symptoms of "wooziness" and a sore on his penis with penile discharge. Dr. Rallos ordered a complete examination for sexually transmitted diseases, including HIV.

HIV antibody testing was performed by Damon Labs, which forwarded its report to Dr. Rallos. The report contained an HIV ELISA screening test that showed a positive for HIV antibodies, which was verified by repeat analysis. The report also contained the results of a confirmatory test called the Western Blot Essay. The lab reported an "indeterminate" result on this test and provided the following instructions for interpreting the results of the essay:

"O =   NO BAND DEMONSTRATED

0.5 =   VERY WEAK BAND PRESENT

1 =   WEAKLY POSITIVE

2 =   MODERATELY POSITIVE

No. 1-04-2979

3 =    STRONGLY POSITIVE

***

POSITIVE:          THE PRESENCE OF ANY TWO OR MORE OF THE

FOLLOWING BANDS WITH AN INTENSITY > 0.5,

P24, gp 41, AND gp 120/160.

NEGATIVE:          NO BANDS DEMONSTRATED.

INDETERMINATE:  VIRAL BANDS ARE PRESENT BUT CRITERIA FOR

POSITIVE RESULTS ARE NOT MET.  A FOLLOW-UP

SPECIMEN WILL BE REQUIRED WITHIN 6 MONTHS."

Dr. Rallos noted that the scores reported on the Western Blot Essay found bands at P24 and gp

160 with an intensity of 1.

Damon Labs also performed a recombinant DNA test, which reported a negative result.

Dr. Rallos had not heard of this test.  The lab documentation stated the following:

"THE RECOMBINANT DNA ASSAY PROVIDES THE DEFINITIVE

DIAGNOSIS FOR THE PRESENCE OR ABSENCE OF HIV ANTIBODIES TO

THE ENVELOPE ANTIGENS.  ALL INDETERMINATE WESTERN BLOT

RESULTS WILL AUTOMATICALLY BE REFLEXED TO THE

RECOMBINANT DNA ASSAY.  THESE CRITERIA HAVE BEEN

DEVELOPED BY WALTER REED ARMY INSTITUTE OF RESEARCH AND

ARE BASED ON OVER 50,000 WESTERN BLOT DETERMINATIONS

CONDUCTED BY DAMON CLINICAL LABORATORIES UNDER

–4–

CONTRACT WITH THE U.S. ARMY."

On September 15, 1992, Dr. Rallos told plaintiff that he had tested positive for HIV.  Dr. Rallos diagnosed plaintiff with HIV based on the results of the ELISA screening test and the Western Blot Essay.  Dr. Rallos made recommendations for further care and counseling and ordered baseline tests to measure plaintiff's general health.  Dr. Rallos testified that plaintiff was quiet and receptive at the time.  Dr. Rallos did not restrict any of plaintiff's activities, except for sexual contacts.

Thereafter, Dr. Rallos followed plaintiff quarterly to monitor his emotional well-being and CD4 count.  Dr. Rallos testified that both factors are important.  The CD4 count is important because a number below 500 indicates that a patient is deteriorating.  If a patient remains largely asymptomatic and the CD4 count is above 500, monitoring should be sufficient.  If the CD4 count falls below 500, the patient should be referred to an infectious diseases specialist.

Dr. Rallos testified that in October 1992, plaintiff reported that he was not depressed and that plaintiff had a CD4 count of 955.  Dr. Rallos followed up with plaintiff again on December 22, 1992, after plaintiff dislocated his shoulder playing football.  Dr. Rallos testified that plaintiff denied being depressed at that time and had a CD4 count of 965.  Dr. Rallos referred plaintiff to an orthopedist.  Dr. Rallos testified that she also referred plaintiff to an infectious diseases specialist at Rush Presbyterian St. Luke's Hospital for a second opinion because she did not have a great deal of experience with HIV patients.  Defendant testified that she provided the address and telephone number for the infectious diseases specialist on the referral form.  The referral was good until January 22, 1993.  Dr. Rallos testified that she gave the referral form to a nurse and

did not know whether the nurse gave plaintiff the form.

Dr. Rallos knew that plaintiff followed through on the referral to the orthopedist because she received a letter confirming it. Dr. Rallos assumed that plaintiff followed through on the referral to the infectious diseases specialist, but did not ask plaintiff about it. Dr. Rallos did not hear from the consulting specialist.

Dr. Rallos saw plaintiff again on March 30, 1993, and observed no change in his condition. Dr. Rallos testified that during a July 27, 1993 appointment, plaintiff was upset due to his mother's death, but did not express any emotional difficulty regarding the HIV diagnosis.

Dr. Rallos' notes show that on November 9, 1993, plaintiff was doing well clinically, but that his CD4 count had fallen to 344. Dr. Rallos then referred plaintiff to Dr. Russell Petrak, an infectious diseases specialist, for drug therapy "ASAP." This was the last time that Dr. Rallos treated plaintiff.

Dr. Petrak, who first saw plaintiff on November 15, 1993, testified that he also diagnosed plaintiff as HIV positive. Dr. Petrak was unfamiliar with the recombinant DNA test. Dr. Petrak prescribed AZT and told plaintiff that he would be retested at some point. At later appointments, Dr. Petrak never found plaintiff to be depressed or experiencing emotional problems, though he noted on April 25, 1994, that plaintiff was "stressed out mentally" because his daily and recreational activities were decreased after breaking an arm playing basketball.

Dr. Petrak testified that his notes for May 2, 1994, showed a CD4 count of 918. Dr. Petrak then questioned the prior diagnosis, given the sudden rise in the CD4 count. Dr. Petrak sent plaintiff for follow-up testing, which showed a negative ELISA test and an indeterminate

Western Blot Essay. Dr. Petrak believed that the 1992 test was a false positive. Dr. Petrak told plaintiff that the serology showed that he was not HIV positive and discontinued the AZT treatment. Dr. Petrak referred plaintiff back to Dr. Rallos and recommended a follow-up test in November 1994. Dr. Petrak also wrote to Dr. Rallos regarding plaintiff's case. Plaintiff never received follow-up testing from Dr. Rallos or Dr. Petrak.

Dr. Jay Matthew Ehrlich, an associate medical director in clinical safety for Abbott Laboratories, testified that he worked at Family Health Specialists from 1993 to 1996 as a medical resident. Dr. Ehrlich performed a physical examination of plaintiff on October 19, 1994. Dr. Ehrlich did not review plaintiff's entire chart at that time. Dr. Ehrlich opined that the original HIV test was indeterminate, based on the Western Blot Essay result as reported by Damon Labs. Dr. Ehrlich also testified that he would defer to a specialist in interpreting the bands on the Western Blot Essay.

Dr. Ehrlich opined that Dr. Rallos deviated from the standard of care by informing plaintiff that he was HIV positive instead of indeterminate, though plaintiff would have been instructed to behave as though he had HIV and to be retested in six months. Dr. Ehrlich also testified that the standard of care required defendant to call the lab to discuss the results or to refer plaintiff to an infectious diseases specialist.

The circuit court sustained an objection to Dr. Ehrlich's opinion that plaintiff never got the referral slip or knew that he should go to Rush Presbyterian St. Luke's Hospital. Dr. Ehrlich did not work at Family Health Specialists in December 1992, when Dr. Rallos said that she referred plaintiff to Rush Hospital, but testified that he was familiar with the office policies from

1993 to 1996 and saw similar paperwork from 1992. Dr. Ehrlich testified that a doctor would fill out basic information on a referral form, but that someone else would ensure the referral was within the HMO network and make an appointment for the patient. Dr. Ehrlich testified that the referral slip at issue contained no information about an appointment, suggesting that the paperwork was not processed.

Plaintiff's witness, Dr. Roberta Luskin-Hawk, who is board-certified in infectious diseases and internal medicine, with expertise in HIV infection cases, testified about the testing procedures for detecting HIV. Dr. Luskin-Hawk testified that while the initial Western Blot Essay was reported as indeterminate, it was possible to look at the results and believe that the result was positive. Dr. Luskin-Hawk testified that Damon Labs had a standard that any time a Western Blot Essay was indeterminate, a PCR test or a recombinant DNA test would be performed to attempt to clarify the result. Dr. Luskin-Hawk opined that Dr. Rallos could have met the relevant standard of care had she either called the laboratory for clarification of the test results or referred plaintiff to a specialist. Dr. Luskin-Hawk further testified that if plaintiff had been retested within six months, doctors would have had a clearer indication that plaintiff was not HIV positive at an earlier time.

Dr. Scott Kale provided similar testimony about the standard of care. Dr. Kale also testified over objection regarding the recombinant DNA test and how that test explains the apparent contradiction between the lab's conclusion that the Western Blot Essay result was indeterminate and the presence of two bands with a strength of 1 in that test.

Dr. David Simon, an infectious diseases specialist with expertise in HIV diagnosis and

treatment, testified for the defense that while he personally would have contacted the laboratory about the test results, Dr. Rallos met the applicable standard of care. Dr. Simon was cross-examined on his prior deposition testimony that the applicable standard of care required defendant to find out the reason the laboratory reported an indeterminate result.

Defense witness Dr. Patrick Sullivan, who is board-certified in internal medicine, testified that Dr. Rallos complied with the applicable standard of care. Dr. Sullivan opined that Dr. Rallos was not required to simply accept the indeterminate laboratory test result, particularly where plaintiff was at risk for HIV infection based on the clinical, historical and physical examination criteria. Dr. Sullivan opined that Dr. Rallos was not required to immediately refer plaintiff to a specialist because the referral doctor was unlikely to have done anything in the short term other than monitor plaintiff's CD4 count. Dr. Sullivan further opined that it is better for a patient to hear a positive diagnosis than an indeterminate one, as the patient does not suffer the anguish of uncertainty.

Plaintiff testified that he was 23 years old when he was diagnosed with HIV. Plaintiff testified that he was raised in the Englewood neighborhood of Chicago, which he described as a tough area where gang violence, drugs and prostitution are prevalent. Plaintiff testified that he stayed away from these criminal elements because he wanted something better for himself. Plaintiff testified that he lettered in football and basketball in high school and was an all-area, tournament MVP.

Plaintiff testified that he was the first individual in his family to attend college. Plaintiff was recruited to play basketball at the University of Wisconsin, but did not play there because he

was not offered a full scholarship. Plaintiff first attended Southeastern Illinois in Harrisburg, then attended Park College in Parkville, Missouri, where he was team MVP and most inspirational player. Plaintiff worked with a support group for troubled kids. Plaintiff had a summer job as a campus security guard. Plaintiff graduated in 1991 with a B+ average, earning a degree in criminology and probation.

Plaintiff testified that he was laid off from his job with a pipeline company in 1991, because he did not want to relocate. Plaintiff was hired as a security officer at the University of Chicago in April 1992. Five months later, on the day he had blood drawn for the initial HIV test, plaintiff was arrested by the Chicago police department. Plaintiff later pleaded guilty to unlawful use of a weapon. Plaintiff was placed on supervision for one year and subsequently had the arrest expunged from his record. Plaintiff was fired from the security job as a result of his arrest, but he testified that he was not bothered by his termination and began to look for another job.

Plaintiff testified that after he was diagnosed with HIV, he considered committing suicide and feared having his body deteriorate and becoming a social outcast. Plaintiff testified that within weeks, he began associating with gang members, carrying a gun, selling marijuana and gambling. He was involved in drive-by shootings and was named the treasurer of his gang. Plaintiff testified on direct examination that Dr. Rallos never gave him a referral in December 1992 to an infectious disease specialist. On cross-examination plaintiff testified that he did not recall Dr. Rallos giving him a referral in December 1992 to Rush Hospital to be seen by an infectious diseases specialist, but that he went somewhere for blood work. Plaintiff testified that after the HIV-negative diagnosis, he disassociated himself from the gang and obtained a number

of security jobs with the Chicago Public Schools, the Stanley Smith firm and Jewel/Osco stores.

Defendant sought to introduce evidence that plaintiff was arrested in 1990 for obstructing traffic during the sale of narcotics; that plaintiff was arrested and fired from his job, one month before the diagnosis in 1992, due to his involvement in an armed robbery with a gang member and that plaintiff misstated his employment status to the sentencing judge when he pleaded guilty to the unlawful use of a weapon. Defendant also asked to bring out plaintiff's 1993 arrest for gambling, his arrest for disorderly conduct in 1996 and his arrest for drinking in public in 1997. The trial court allowed in part plaintiff's motion *in limine* to bar all of the above arrests, holding that defendant could bring out the arrests for gambling and drinking, the fact that plaintiff was convicted of unlawful use of a weapon but that evidence relating to the arrests for traffic obstruction and disorderly conduct was barred.

Dr. Carl Bell, a board-certified psychiatric neurologist, opined that the HIV-positive diagnosis caused a major traumatic stressor to plaintiff. Dr. Bell testified that in 1992, it was a de facto death sentence that could cause depression and a shortened sense of one's future.

On cross-examination, defendant questioned Dr. Bell regarding a "synopsis of care by defendant" prepared by plaintiff's counsel. The synopsis included a statement that on December 22, 1992, plaintiff was referred to an orthopedist and given a referral slip to see an infectious diseases specialist at Rush Presbyterian St. Luke's Hospital. The synopsis stated that plaintiff followed up with the orthopedist, but not with the infectious disease consult. The synopsis further stated that plaintiff had commented that Rush Presbyterian St. Luke's Hospital was too far away and that he was humiliated by the treatment he received by healthcare providers when they

No. 1-04-2979

found out that he was HIV positive.

At the conclusion of the trial, the jury returned a verdict in favor of plaintiff and answered special interrogatories finding that the proximate cause of plaintiff's injuries was not defendant's initial misdiagnosis, but her failure to perform further investigation into plaintiff's medical condition following the HIV test. The circuit court entered judgment on the verdict. Defendant filed a posttrial motion, which the circuit court denied. Defendant now appeals.

ANALYSIS

A. Motion for Directed Verdict

Defendant first argues that the trial court erred in denying her motion for a directed verdict, claiming that plaintiff failed to satisfy the burden of proof on the element of proximate cause. A motion for directed verdict should be granted when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand." Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510 (1967). A directed verdict is improper where "there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." Maple v. Gustafson, 151 Ill. 2d 445, 454 (1992). The standard of review is de novo. Evans v. Shannon, 201 Ill. 2d 424, 427 (2002).

In a medical malpractice case, proximate cause must be established by expert testimony to a reasonable degree of medical certainty. Simmons v. Garces, 198 Ill. 2d 541, 556-57 (2002), citing Aguilera v. Mount Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 972 (1997), and

-12-

No. 1-04-2979

Townsend v. University of Chicago Hospitals, 318 Ill. App. 3d 406, 413 (2000). Proximate causation is not established where the medical expert testimony is speculative. Northern Trust Co. v. University of Chicago Hospitals & Clinics, 355 Ill. App. 3d 230, 242 (2004).

Relying on cases like Aguilera and Townsend, defendant claims that there was a complete gap in the evidence because plaintiff failed to produce evidence that: (1) contacting an employee from Damon Labs would have told defendant that the test results were not positive; (2) defendant did not refer plaintiff to an infectious diseases specialist; and (3) the alleged failure to retest plaintiff in six months was a proximate cause of his injuries. We address each in turn.

First, defendant maintains that plaintiff failed to produce evidence that a call to Damon Labs would have clarified the "confusing" Western Blot Essay results. Although defendant refers to the results as "confusing," putting the word in quotes as if to suggest that the results were not confusing, the record clearly shows that Damon Labs scored the Western Blot Essay result as indeterminate, but showed two bands with an intensity of 1 – a result that would, by the lab's own documents, suggest that the test result was positive. Plaintiff maintained at trial that defendant's failure to contact the lab to reconcile this apparent contradiction or error was one basis for liability.

It is undisputed that plaintiff did not produce evidence from an employee of Damon Labs on this point. The record, however, contains other evidence relevant to this issue, to which defendant objects in separate arguments in her brief.

For example, plaintiff elicited testimony from Dr. Kale about the recombinant DNA test and how that test explains the apparent contradiction between the lab's conclusion that the

-13-

No. 1-04-2979

Western Blot Essay result was indeterminate and the presence of two bands with a strength of 1 in that test. On appeal, defendant argues that the trial court erred in admitting such evidence without sufficient foundation. Defendant objected to Dr. Kale's testimony at trial by reference to her prior motion *in limine* on the issue, but not for lack of foundation. The motion refers to his deposition testimony that he was "not familiar" with the test. Dr. Kale testified that his familiarity with the test was limited to the statements made in the documentation provided by Damon Labs, but opined on the meaning of that documentation based on his expertise in immunology.

In addition, defendant argues on appeal that this testimony was prejudicial because it "left the jury with the inaccurate picture that Dr. Rallos, as an internal-medicine physician, should have been qualified to interpret the results of this test, and that she breached this duty to her patient." However, defendant's position at trial was that she, as an internal medicine physician, <u>was</u> qualified to interpret the seemingly contradictory results of the Western Blot Essay and partially base her diagnosis thereon.

Similarly, Dr. Luskin-Hawk testified about the role that the recombinant DNA test played in confirming or clarifying Western Blot Essay results, including the fact that either that test or a PCR test was required by the Illinois Administrative Code in certain cases. Defendant objected to such testimony in a motion *in limine*, but did not renew the objection at the videotaped deposition session shown to the jury. When a motion *in limine* is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review. <u>Simmons v. Garces</u>, 198 Ill. 2d 541, 569 (2002). Moreover, when an objection is made, specific

grounds must be stated and other grounds not stated are waived on review. First National Bank v. Glen Oaks Hospital & Medical Center, 357 Ill. App. 3d 828, 838 (2005). Accordingly, the objection is waived on appeal. See, e.g., Spurgeon v. Mruz, 358 Ill. App. 3d 358, 361 (2005).

Second, defendant claims that there was no evidence that she failed to refer plaintiff to an infectious diseases specialist. There is some evidence that defendant made such a referral on December 22, 1992. The record also contains evidence suggesting that plaintiff never got the referral. Plaintiff first denied and then said he did not recall receiving the referral and the record suggests that plaintiff generally followed defendant's instructions, including following through on a referral to an orthopedist made on the same date as the referral in dispute. Dr. Ehrlich testified that the incomplete state of the referral form suggested that it had not been processed by the office staff, based on his knowledge of Family Health Specialists' office practices. Defendant complains on appeal that the admission of this testimony was error, but the record shows that defendant did not object to it at trial. Moreover, defendant's argument that the testimony should have been barred as violating Supreme Court Rule 213 (210 Ill. 2d R. 213) fails, as this testimony related to factual office practices, not expert medical opinion. See Seef v. Ingalls Memorial Hospital, 311 Ill. App. 3d 7, 23 (1999). Indeed, the transcript shows that the trial court sustained defendant's objection to Dr. Ehrlich's opinion that plaintiff did not receive the referral. Defendant maintains that Dr. Ehrlich's testimony regarding the office practices lacked foundation. Again, defendant made no such objection at trial, though the trial court sustained foundational objections to other parts of Dr. Ehrlich's testimony when defendant made them. Furthermore, Dr. Rallos testified that she gave the referral form to a nurse but that she had "no

idea" whether plaintiff ever received the referral. Also, Dr. Rallos testified that she never contacted the specialist to whom plaintiff was supposedly referred or had any follow-up discussion with plaintiff about the purported referral.

Third, the record shows that plaintiff did produce evidence that the alleged failure to retest plaintiff in six months was a proximate cause of his injuries. For example, Dr. Luskin-Hawk testified that there was no reason to believe that a retest in 1992 or 1993 would have shown anything different from the retests done in 1994 and 2000 – i.e., that plaintiff was not HIV positive. Defendant states that the 1994 test showed a band with an intensity of 3, which ignores that the ELISA test was negative in 1994 and that a single band on the Western Blot Essay is not a positive result. Defendant also claims that Dr. Luskin-Hawk's testimony was speculative, but the transcript of the videotaped deposition shown to the jury states as follows:

"Q. Now if this patient was retested six months after the initial test in March of 2003 [sic], the retest could easily have shown another actual result with a p24 and a gp160 of an intensity of 1, correct?

A. It would be hard to speculate what would be seen. Given that, subsequently, it had only p24, I think it would be difficult to assume what would be seen there."

Again, this answer addresses the Western Blot Essay, not the ELISA. Dr. Luskin-Hawk testified that the Western Blot Essay is a confirmatory test to the ELISA. Dr. Luskin-Hawk also testified that if a patient is HIV positive with an indeterminate Western Blot Essay, a six-month retest of the Western Blot should come back positive. Based on the record, not having certainty about the exact results of the Essay (while suggesting they would not have been the same) does not

undermine Dr. Luskin-Hawk's overall opinion that a retest in 1992 or 1993 would have shown that plaintiff was not HIV positive.

Defendant also argues that the evidence noted above does not establish proximate cause, asserting that telling plaintiff he had an "indeterminate" result would have been accompanied by advice that plaintiff behave as though he was HIV positive. Thus, defendant concludes that the emotional distress and alteration of plaintiff's activities would have been the same as with the positive diagnosis. Plaintiff correctly notes that Drs. Luskin-Hawk, Kale, Bell, Simon and Spadoni all testified that an indeterminate diagnosis was significantly different from a positive diagnosis in 1992, when the former would offer some hope, but the latter was seen as an effective death sentence. Defendant's expert, Dr. Sullivan opined that a positive diagnosis caused less distress, which the jury was free to discard and which does not support the argument defendant now makes on appeal – that the damages would be the same.

In sum, as noted above, a directed verdict is improper where "there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." Gustafson, 151 Ill. 2d at 454. Plaintiff presented evidence on the element of proximate cause. Accordingly, defendant has failed to show that the trial court should have granted the motion for a directed verdict.

We note that neither party addressed at trial or on appeal whether plaintiff could recover damages in this case without proving physical injury. This appears to be a case of first impression in Illinois. Other courts have allowed recovery of damages for emotional distress as a

result of medical negligence in circumstances concerning the misdiagnosis of illness where the misdiagnosis is based on false-positive conclusions on medical tests. However, jurisdictions have differed regarding the type of injury necessary to recover damages. See C. Vento, Physical Injury Requirement For Emotional Distress Claim Based On False Positive Conclusion On Medical Test Diagnosing Disease, 69 A.L.R. 5th 411 (1999).

Some jurisdictions require a physical injury or physical peril related to the emotional distress for the distress to be compensated. See Kennedy v. University of Cincinnati Hospital, No. 94API09-1333 (Ohio App. March 30, 1995) (affirming damages where false- positive HIV test was the reason for the patient's hysterectomy, which caused physical injury and emotional distress); M.M.H. v. United States, 966 F.2d 285 (7th Cir. 1992) (applying Wisconsin law) (finding that suicide attempt satisfied the physical injury requirement for recovery for emotional distress). The nonexistence of physical injury or physical danger has led some courts to deny emotional distress claims. See Heiner v. Moretuzzo, 73 Ohio St. 3d 80, 652 N.E.2d 664 (1995) (patient could not recover damages for negligent infliction of emotional distress where the misdiagnosis of HIV did not cause actual physical peril); Verinakis v. Medical Profiles, Inc., 987 S.W.2d 90 (Tex. 1App. 998) (life insurance applicant's alleged reaction after receiving false-positive result for HIV, which included anxiety-related sweating spells, depression, withdrawal, insomnia, and bruising and swelling from repeated blood draws for HIV follow-up, did not rise to the level of "serious bodily injury" necessary to support the recovery of mental anguish damages); Griffin v. American Red Cross, Civ. A. No. 93-5924 (E.D. Pa. November 28, 1994) (applying Pennsylvania law) (plaintiff failed to allege sufficient physical injury; mistaken

diagnosis of HIV was corrected one day later; and Pennsylvania law does not recognize a cause of action for negligent infliction of emotional distress based on a fear of contracting acquired immune deficiency syndrome (AIDS)).  Other jurisdictions have taken the position that liability can be imposed for negligent infliction of emotional distress without an accompanying physical injury.  See Schulman v. Prudential Insurance Co. of America, 640 N.Y.S 2d 112, 226 A.D.2d 164 (1996); Chizmar v. Mackie, 896 P.2d 196 (Alaska 1995); Machesney v. Bruni, 905 F. Supp. 1122 (D.C. 1995); McKone v. Addiss, No. CV94 053 59 64 (Conn. Super. May 11, 1995); Bramer v. Dotson, 190 W. Va. 200, 437 S.E.2d 773 (1993).

In Illinois, our supreme court has determined that without proof of actual exposure to HIV, a claim for fear of contracting AIDS is too speculative to be legally cognizable.  Majca v. Beekil, 183 Ill. 2d 407 (1998).  While our supreme court has required proof of actual exposure to HIV for claims based on a fear of contracting AIDS, we recognize that the present situation differs where plaintiff received an actual, but false, diagnosis of HIV.  We also note that some courts in Illinois have required that a plaintiff allege sufficient physical injury in medical malpractice actions for a misdiagnosis or delay in diagnosing certain medical conditions.  See Gauthier v. Westfall, 266 Ill. App. 3d 213 (1994) (patient's evidence was insufficient to provide basis upon which jury could conclude that any negligence by physician in failing to earlier diagnose malignancy of patient's breast proximately caused any injury); Perez v. Hartmann, 187 Ill. App. 3d 1098 (1989) (affirming damages for plaintiff where plaintiff alleged that, had physician interpreted his medical test properly, the physician would not have recommended the implantation of a permanent pacemaker, which was subsequently removed).  We raise this issue

No. 1-04-2979

for the benefit of future litigants as it was not addressed by the parties in the instant case.

B. Mitigation of Damages

Defendant next contends that the trial court erred in several rulings relating to defendant's defense that plaintiff failed to mitigate damages by failing to follow through on the purported December 22, 1992, referral to an infectious diseases specialist. The trial court granted plaintiff's motion to bar evidence of the defense. The trial court later granted a directed verdict on the defense and refused to tender a jury instruction on the defense.

Defendant claims these errors were made because the trial court failed to distinguish between the concepts of mitigation of damages and contributory negligence. Mitigation of damages is a distinct concept that is separate from contributory negligence. Grothen v. Marshall Field & Co., 253 Ill. App. 3d 122, 128 (1993). Contributory negligence involves circumstances where the plaintiff's negligence is a legally contributing cause of his harm if it is a substantial factor in bringing about his harm. Grothen, 253 Ill. App. 3d at 128. In contrast, the rule of mitigation of damages involves imposing a duty upon the injured party to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted. Grothen, 253 Ill. App. 3d at 128.

In this case, plaintiff filed a pretrial motion *in limine* which, by its title, sought to "bar any reference to contribution against the plaintiff." However, the substance of the motion was directed to defendant's previously filed mitigation defense. Defendant correctly notes that the trial court, in hearing the motion, referred to contribution. Defendant fails to note that the transcript shows that defense counsel correctly informed the court that the motion was directed to

mitigation, not contribution. Moreover, while the trial court granted plaintiff's motion, defendant moved to reconsider and the trial court took that motion under advisement. The trial court allowed its initial ruling to stand, but stated that it would allow defendant to produce evidence that could reduce the damages. The trial court clarified that "at this point *** you cannot affirmatively state that he had a duty to mitigate his damages from this diagnosis." (Emphases added.)

A ruling on a motion *in limine* is a determination addressing an admissibility of evidence issue likely to arise at trial and is subject to reconsideration. Schuler v. Mid-Central Cardiology, 313 Ill. App. 3d 326, 333-34 (2000). Thus, to preserve an error in the exclusion of evidence, the proponent of the evidence must make an adequate offer of proof in the trial court. Sinclair v. Berlin, 325 Ill. App. 3d 458, 471 (2001). Failure to make such offer of proof results in waiver of the issue on appeal. Sinclair, 325 Ill. App. 3d at 471.

In this case, the trial court made the interlocutory nature of its ruling clear. At trial, defendant introduced evidence relevant to the mitigation defense. Defendant herself testified regarding the December 22, 1992, referral. Defendant also questioned Dr. Bell regarding the "synopsis of care by defendant" prepared by plaintiff's counsel. Plaintiff did not object to any of this testimony. Defendant has identified no offer of proof as to any additional evidence of her defense that she was barred from introducing at trial. Given this record, defendant suffered no prejudice from the trial court's ruling on the motion *in limine*.

The issues of whether the trial court properly directed a verdict on the defense and barred a jury instruction thereon is different. As noted above, the quantum of evidence needed to

survive a motion for a directed verdict or receive a pattern instruction on a defense is relatively low. In this case, almost all of the evidence produced at trial suggests that plaintiff did not receive a referral to an infectious diseases specialist on December 22, 1992. The exception is the "synopsis of care" document prepared by plaintiff's counsel and furnished to plaintiff's expert Dr. Bell.

In cross-examining Dr. Bell, defense counsel read several excerpts from the "synopsis" suggesting that plaintiff was referred to an infectious disease specialist in December 1992 by Dr. Rallos. In response to these excerpts, Dr. Bell replied "That's what it says." During the exhibit conference, defense counsel asked to admit this synopsis as defense exhibit number 26. Plaintiff's counsel objected to admitting the exhibit into evidence. The trial court sustained the objection, concluding that the synopsis had been prepared "by someone for the purpose of this litigation" and refused to allow it into evidence. The record also shows that when defendant cited Dr. Bell's testimony in support of her argument in opposition to plaintiff's motion for directed verdict, the circuit court stated that the synopsis should not have been admitted into evidence. The circuit court stated that it would disregard the evidence regarding the synopsis and determined that it would allow the defendant to argue the issue but would not instruct the jury on the affirmative defense.

When this court addressed this issue in our original opinion, we upheld the circuit court's exclusion of the synopsis from evidence and from considering it for purposes of granting or denying the motion for directed verdict. However, we held that the circuit court erred in granting a directed verdict on defendant's mitigation defense based on the testimony of Dr. Rallos and

plaintiff. Jones v. Rallos, 373 Ill. App. 3d at 450. Upon reviewing the record after the entry of the supreme court's supervisory order, we now reconsider our prior holding. Dr. Rallos testified that she "had no idea" whether plaintiff was ever given the infectious disease referral. Further, plaintiff testified on direct that Dr. Rallos never gave him such a referral in December 1992. Plaintiff's testimony on cross-examination was that he did not recall receiving any such referral in December 1992. The above evidence is not conflicting nor does it constitute a "substantial factual dispute" under Maple v. Gustafson, 151 Ill. 2d at 454. Consequently, the circuit court did not err in granting a directed verdict on defendant's mitigation defense.

### C. Evidence of Failing Board Certification Exams

Defendant contends that the trial court erred in denying defendant's motion *in limine* seeking to bar questions relating to the defendant having failed the board-certification examination for internal medicine. Plaintiff's counsel took advantage of this ruling when he called Dr. Rallos in plaintiff's case-in-chief. After approximately ten questions, plaintiff's counsel brought out that Dr. Rallos had failed the board-certification examination for internal medicine on two occasions some 20 years after she had become licensed to practice medicine.

A trial court's ruling on a motion *in limine* addressing the admission of evidence will not be disturbed on review absent a clear abuse of discretion. Swick v. Liautaud, 169 Ill. 2d 504, 521 (1996). An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view. People v. Illgen, 145 Ill. 2d 353, 364 (1991).

The appellate court has addressed the issue of the admissibility of a physician witness's

failure to pass board-certification examinations on several occasions. In McCray v. Shams, 224 Ill. App. 3d 999, 1002 (1992), *appeal denied,* 145 Ill. 2d 635 (1992), the trial court granted the defendant's motion *in limine* precluding plaintiff from eliciting evidence that the defendant doctor had failed to pass the board-certification examination in internal medicine. The jury returned a verdict in favor of the defendant. The appellate court first found that Dr. Shams had testified as an expert witness where he regarded himself as a specialist in the field of internal medicine. He further testified as to why he treated the plaintiff for a viral infection rather than a bacterial one and why he did not order blood cultures or consult with a specialist. McCray v. Shams, 224 Ill. App. 3d at 1003.

However, the appellate court concluded that the trial court did not err in granting the defendant's motion *in limine* where the jury was informed that Dr. Shams was not board certified and the plaintiff's expert testified that the standard of care was the same for a board-certified physician as for a nonboard-certified physician. McCray v. Shams, 224 Ill. App. 3d at 1004.

In Kurrack v. American District Telegraph Co., 252 Ill. App. 3d 885, 900-01 (1993), the appellate court found that the expert witness' failure to pass the board-certification examination in internal medicine was relevant to his credibility on the subjects to which he was testifying.

In Rockwood v. Singh, 258 Ill. App. 3d 555 (1993), the plaintiff argued that the trial court erred in barring her from making any reference to the defendant physician's failure to become a board-certified neurosurgeon. The appellate court held:

> "Generally, when a physician sued for malpractice testifies as an expert,
> evidence as to his age, practice, and like matters relating to his qualifications as

an expert is admissible. [McCray v. Shams, 224 Ill. App. 3d 999 (1992).] In such

cases, the failure to pass board certification examinations is relevant and

admissible." Rockwood v. Singh, 258 Ill. App. 3d at 557.

The court went on to distinguish the testimony of the treating physician in McCray as

compared to Dr. Singh's testimony. "[Dr. Singh]'s testimony was not used to show the standards

of medical care associated with such surgery but, rather, was used to relate to the jury what

occurred before, during, and after the surgery. For these reasons, the circuit court correctly

barred reference to defendant's board-certification status." Rockwood, 258 Ill. App. 3d at 558.

Finally, in Gossard v. Kalra, 291 Ill. App. 3d 180 (1997), the appellate court held that the

trial court did not abuse its discretion in barring the admission of evidence concerning the

defendant physician's prior failed attempts to pass the board-certification examinations in

radiation oncology where the defendant became board certified more than six years prior to the

plaintiff's treatment.

In the instant case, Dr. Rallos testified that at the time she treated plaintiff, she had very

little experience in treating patients who had tested positive for HIV. She further testified that

she did not understand what some of the test results meant. Consequently, we find that Dr.

Rallos' factual situation and testimony regarding the same were more similar to that of Dr. Singh

in Rockwood than that of Dr. Sham's in McCray. However, where the trial court's ruling was

made after considering briefing on the subject and having considered the cases discussed above,

we cannot say that the trial court abused its discretion in denying defendant's motion *in limine* to

bar questions regarding defendant's failure to pass the board-certification examination. In accordance with the supreme court's supervisory order, we also hold that, even if the trial court erred in denying the motion *in limine*, such error did not constitute reversible error.

### D. Evidence of Plaintiff's Criminal Behavior

Defendant also contends that the circuit court erred in barring evidence of plaintiff's criminal behavior, which defendant argues is relevant to the issues of causation and damages. Defendant sought to introduce evidence that plaintiff was arrested in 1990 for obstructing traffic during the sale of narcotics; was arrested and fired from his job, one month before the diagnosis in 1992, due to his involvement in an armed robbery with a gang member; and misstated his employment status to the sentencing judge when he pled guilty to the unlawful use of a weapon. Defendant also asked to bring out plaintiff's 1993 arrest for gambling, his arrest for disorderly conduct in 1996 and his arrest for drinking in public in 1997. The trial court allowed, in part, plaintiff's motion *in limine* to bar all of the above arrests, holding that defendant could bring out the arrests for gambling and drinking and the fact that plaintiff was convicted of unlawful use of a weapon but that evidence relating to the arrests for traffic obstruction and disorderly conduct was barred. The court also restricted the evidence relating to the unlawful use of a weapon to the fact the defendant pled guilty to that misdemeanor charge. The court did not allow defendant to bring out the fact that plaintiff's weapon had been used in an armed robbery in which a witness told the police that the person who committed the armed robbery left the scene in a car owned by plaintiff's brother or further, that the police arrested the armed robber while he was in a car with plaintiff. The court allowed defense counsel to *voir dire* the plaintiff outside the presence of the

jury and make an offer of proof as to what the police reports said. The trial court also barred defendant from bringing out that plaintiff testified at his sentencing hearing on the unlawful use of weapons charge that he was still employed by the University of Chicago. In fact, plaintiff had been fired one month earlier. In doing so, the circuit court said it had weighed the probative value of the evidence against its prejudicial effect.

Generally, character evidence is inadmissible when a party's character is not in issue. Lebrecht v. Tuli, 130 Ill. App. 3d 457, 473 (1985). Evidence is relevant when it tends to prove a fact in controversy or render a matter in issue more or less probable. Lebrecht, 130 Ill. App. 3d at 473; see also Pluto v. Searle Laboratories, 294 Ill. App. 3d 393, 398 (1998) (lifestyle choices of persons in suspect category were in issue where it was not the intrauterine device manufactured by defendant but the lifestyle choices that placed persons in suspect category at risk for the contraction of sexually transmitted diseases).

Here, plaintiff's character and lifestyle prior to his 1992 HIV diagnosis were in issue where plaintiff argued that his lifestyle changed and that he engaged in criminal activity because of the false HIV diagnosis. Plaintiff testified that prior to the HIV diagnosis, he was not involved with gangs, drugs, or guns and stayed away from the criminal element. Plaintiff testified that following the HIV diagnosis, he began associating with gang members, carrying a gun, selling marijuana and gambling. Plaintiff also became involved in drive-by shootings. When this court first considered this issue, (Jones v. Rallos, 373 Ill. App. 3d at 448), we did not cite the standard of review, which is abuse of discretion. Swick v. Liautaud, 169 Ill. 2d at 521. In deciding this issue, the trial court considered the parties' briefs and arguments, offers of proof and the *voir dire*

of plaintiff. The trial court then allowed testimony regarding plaintiff's arrests for gambling, drinking and unlawful use of weapon. The court barred the fact that plaintiff had been arrested for obstructing traffic and disorderly conduct and limited some of the facts related to plaintiff's unlawful use of a weapon charge. In doing so the trial court found that the excluded evidence was more prejudicial than probative. We cannot say that this ruling was an abuse of discretion.

### E. The Evidentiary Rulings

Defendant further argues that the trial court made a number of other errors in its rulings admitting and excluding evidence at trial. Defendant argues that the trial court erred in admitting Dr. Ehrlich's testimony regarding his opinion that plaintiff never received the December 22, 1992 referral to an infectious diseases specialist. As discussed above, the record shows that the trial court in fact sustained defendant's objection to that opinion testimony, but permitted Dr. Ehrlich to testify about the factual office practices regarding referrals generally, and defendant did not object to the foundation for that testimony at trial.

Defendant also argues that the trial court improperly allowed Dr. Ehrlich to opine on the standard of care, even though he was a medical student in 1992. Defendant makes this argument in a single paragraph, without citation to either the record or case law, which should result in waiver on appeal. However, plaintiff notes that the record shows that defendant withdrew her motion *in limine* on this point.

Defendant argues that the trial court improperly allowed Dr. Kale to testify regarding the recombinant DNA test. These arguments are discussed earlier and will not be repeated here.

Defendant argues the trial court erred in allowing testimony from Dr. Simon that he

personally would have called Damon Labs to investigate why the Western Blot Essay result was labeled indeterminate. A review of the record shows that plaintiff was allowed to impeach Dr. Simon at trial with his prior deposition testimony that his "best answer" was that defendant's standard of care required her to make some effort to find out what the lab meant by reporting the result as indeterminate. Later in the same deposition, Dr. Simon testified that this was not the general standard of care. Allowing these matters at trial was not reversible error. While a plaintiff cannot establish a prima facie case of medical negligence based solely on the testimony of another physician that he or she would have done things differently, an expert medical witness's personal preferences can be relevant because it affects the persuasive value of the expert's opinions. Gallina v. Watson, 354 Ill. App. 3d 515, 521 (2004).

Defendant argues that the trial court erred in barring evidence that plaintiff fathered three children with three different women in the 1990s, had multiple sex partners and suffered from hepatitis and gonorrhea. Defendant argued that a person's psychiatric response to an HIV positive diagnosis depends on whether the person has any reason to expect possible exposure. Defendant's brief cites no evidence suggesting that multiple heterosexual partners or contraction of other sexually transmitted diseases should give a person reason to expect that he or she has exposed to HIV. Thus, defendant has not shown an abuse of discretion in excluding the material.

Finally, defendant argues that the trial court erred in allowing testimony regarding the Illinois Administrative Code. As noted above, this issue was waived by defendant's failure to object when Dr. Luskin-Hawk's testimony was taken.

No. 1-04-2979

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and GREIMAN, JJ., concur.