No. 3--09--0065

Filed April 28, 2010

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2010

| | | |
|---|---|---|
| LEONARD PAVNICA and PATRICIA PAVNICA, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit Will County, Illinois |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 05--L--572 |
| EDWIN VEGUILLA, and ANDREW ZWOLSKI, Individually and as Agents, Servants and/or Employees of PRAIRIE EMERGENCY SERVICES, S.C., a Corporation, and PRAIRIE EMERGENCY SERVICES, S.C., a Corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees, | ) ) | Honorable Susan T. O'Leary, Judge, Presiding. |

JUSTICE SCHMIDT delivered the opinion of the court:

Plaintiffs, Leonard and Patricia Pavnica, brought this medical malpractice and loss of consortium action against defendants Edwin Veguilla, M.D., Andrew Zwolski, M.D., and Prairie Emergency Services, S.C. Following a trial in the circuit court of Will County, a jury returned a verdict in defendants' favor. Plaintiffs appeal, arguing that the trial court erred in denying their posttrial motion. In that motion, they argued they were

entitled to a new trial based on an erroneous ruling on their motion *in limine* that allowed defendants to testify to their military service.  They further requested that a judgment be entered in their favor, claiming the jury's verdict was "wholly unwarranted, arbitrary, unreasonable, and was against the manifest weight of the evidence."  We affirm.

## FACTS

In October of 2003, Leonard had a pancreas and kidney transplant.  Leonard was a diabetic and knew the importance of checking his feet for cuts and injuries.  As a result of the transplant, Leonard was also placed on immunosuppressive medication which he knew gave him more reason to be concerned about minor injuries.

On December 19, 2003, Leonard stubbed his toe on a piece of furniture in his home and believed that he may have broken it.  From watching the Discovery channel, Leonard knew a technique that involved taping his injured toe to the next toe to help the healing process.

After taping his toes together, Leonard felt that his toe was not healing properly, so he sought medical assistance.  He attempted to see his regular physician, Dr. Deborah Freeman, but she was unavailable until January 2 due to the Christmas holiday season.  Dr. Freeman's office instructed Leonard to go to the emergency room so he proceeded to the emergency room at St.

2

Joseph Provena in Joliet on December 22, 2003. Dr. Veguilla treated plaintiff in the emergency room.

Leonard testified that Dr. Veguilla diagnosed cellulitis/ lymphangitis. Leonard stated that Dr. Veguilla drew a red line on Leonard's leg below the knee and advised him that if the redness went above that line to come back to the emergency room or immediately follow up with his physician. Dr. Veguilla also prescribed Levaquin, an oral antibiotic, and told Leonard to make a follow-up appointment with Dr. Freeman to have his foot re-checked.

Eight days later, on December 30, Leonard returned to the emergency room and was seen by Dr. Zwolski. Leonard returned to the emergency room because he felt the medication was not working and his infection seemed to be getting worse. Dr. Zwolski ordered a battery of tests. This was done, Leonard believed, because Dr. Zwolski suspected a bone infection. After the series of tests that included a blood test and X-rays, Dr. Zwolski concluded the examination and instructed Leonard to follow up with his physician and continue taking the Levaquin.

Leonard testified that he was not admitted to the hospital following his second emergency room visit and no additional antibiotics were added to his course of treatment. He stated that, while in the emergency room, Dr. Zwolski did contact Dr. Freeman to make an appointment for Leonard upon her return.

3

Leonard went to see Dr. Freeman on January 2. Dr. Freeman examined the foot and the infected area and, believing that there was anaerobic infection, admitted plaintiff to the hospital. Leonard stated that he was told the infection looked gangrenous. At the hospital, Leonard was placed on intravenous antibiotics and Dr. Freeman requested an infectious disease consult. Due to the possible consequences of any rejection of his transplants, Leonard was transported to Northwestern Memorial Hospital, where he came under the care of the transplant team that performed his transplants. Leonard testified that the progression of the gangrene became so serious that an amputation of his toes was necessary. An orthopedic surgeon performed the amputation of his toes; eventually another operation was performed to remove a portion of his forefoot.

Plaintiff argued at trial that the emergency room physicians violated the standard of care by failing to place him on anaerobic antibiotics following his emergency room visits. Defendants argued that their choice of the antibiotic regimen was proper and appropriate. Furthermore, defendants asserted that Leonard's condition had improved from the first to the second emergency room visit and, therefore, no change was needed to his antibiotic regimen.

Dr. Freeman testified that if she had known that Leonard had previously been to the emergency room, she would have admitted

4

him to the hospital after talking to Dr. Zwolski during Leonard's second visit.

Dr. Segreti, plaintiffs' retained infectious disease expert, testified that had the antibiotics been changed to include anaerobic coverage, Leonard would not have suffered the amputation of his toes or foot. Dr. Segreti further testified that the only reason Leonard underwent an amputation was due to the infection. He came to this conclusion given the blood flow studies performed at St. Joseph Provena that indicated Leonard had very good blood flow to his lower extremities, especially in the foot and toes. Dr. Segreti also specifically stated that he was not testifying to the standard of care of emergency room physicians.

Plaintiffs called Dr. Michael Rosenberg, who testified that Dr. Veguilla violated the proper standard of care for emergency room physicians by failing to admit Leonard during his first visit. Dr. Rosenberg also testified that it was a violation of the standard of care for Dr. Zwolski not to admit Leonard on his second visit. Dr. Rosenberg's opinions were based on the status of the patient as a diabetic, the patient's recent transplant history, and the fact that Leonard was on antirejection medication. Dr. Rosenberg noted those facts put Leonard at severe risk of infection and rejection.

Dr. Rosenberg further testified that Dr. Veguilla should

5

have taken blood cultures and placed Leonard on an antibiotic that would have covered both aerobic and anaerobic bacteria. Dr. Rosenberg testified that Leonard was not covered for anaerobic bacteria that can develop with injuries of this type to diabetic patients in very tight, closed-off spaces, especially between the webbing of the toes. Dr. Rosenberg opined that the emergency room physicians' treatment of Leonard violated the applicable standard of care.

Defendant Dr. Veguilla testified that he examined Leonard on December 22, 2003, and took a medical history. The physical examination revealed a relatively small area of minimal swelling on the right foot. There was evidence of infection, as manifested by erythema, induration, warmth and mild tenderness. The affected area was about the size of a quarter, or 50-cent piece. The medical history disclosed that Leonard was a diabetic, as well as a multiple-transplant patient. Leonard was taking immunosuppressant medications secondary to the kidney and pancreas transplants.

Dr. Veguilla diagnosed Leonard with cellulitis and lymphangitis. The absence of a note in the medical records measuring the length of the red streak (the lymphangitis) indicates that the streaking did not extend to the mid-foot. He explained that his custom and practice is to document the length of the streak, if clinically significant, but not the length of

6

smaller streaks that "don't really go anywhere."

Dr. Veguilla ordered an injection of Ancef, an antibiotic, and prescribed Levaquin, another antibiotic. Levaquin is a broad spectrum antibiotic, covering a large number of bacteria. In oral form, it provides coverage as comprehensive as intravenous administration. It does not cover anaerobic bacteria.

Before discharging Leonard from the emergency room, Dr. Veguilla discussed with him the importance of getting follow-up care with his own treating physician. Dr. Veguilla recommended that Leonard see his endocrinologist, Dr. Freeman, within two days after discharge from the emergency room. Dr. Veguilla also told Leonard that changes in the condition or appearance of his foot would indicate that he needed to see a doctor sooner. Finally, Dr. Veguilla told Leonard that if he could not get in to see Dr. Freeman, he could return to the emergency room for further evaluation and treatment.

Dr. Zwolski testified that he treated Leonard during his second visit to the emergency room on December 30, 2003. Leonard reported that the pain was better, he had no fever, and the red streaks were no longer present in his foot. Dr. Zwolski noted there was pus draining from the wound, but that this was not necessarily a sign that the infection was worsening.

Dr. Zwolski ordered blood work and an X-ray that ultimately showed a fracture on the fifth toe of the right foot. The blood

7

work included a complete blood count, blood cultures, and a sedimentation rate.

Dr. Zwolski testified that the blood tests showed no indication of an anaerobic infection. Additionally, Leonard's foot did not have the foul odor characteristic of an anaerobic infection. Had there been such an odor, Dr. Zwolski would have noted it in the medical record. Dr. Zwolski opined that Leonard had improved from his first visit to the emergency room. Given Leonard's improvement, Dr. Zwolski did not believe there was an indication for an infectious disease consultation or admission to the hospital. Furthermore, he believed there was no indication to change the antibiotic as it appeared Leonard was benefitting from the Levaquin.

Nevertheless, before discharging Leonard, Dr. Zwolski contacted Dr. Freeman. Per his custom and practice, Dr. Zwolski stated he would have advised Dr. Freeman that Leonard had been in the emergency room previously and that Leonard had been taking Levaquin for seven days. While he believed that Leonard was improving, he still informed Leonard to follow up with Dr. Freeman given his diabetes and transplant history.

Defendants called Dr. Leslie Zun as a standard of care expert on their behalf. Dr. Zun opined that, when seen in the emergency room, Leonard had routine cellulitis and lymphangitis. Leonard's status as a diabetic and transplant patient did not

8

require that this common problem be treated any differently than it would be for any other patient. Had the problem been directly related to his transplant, the treatment might have been different. Leonard needed close follow-up care due to his history, but otherwise treatment for his cellulitis and lymphangitis did not require specialized care and treatment.

Dr. Zun testified that the choice of Levaquin to treat Leonard's infection was within the standard of care. Levaquin is a broad spectrum antibiotic that treats numerous common infections and has very good coverage in oral form. Dr. Zun agreed that Levaquin does not cover anaerobic infection, but such infections are not commonly seen. Dr. Veguilla was not required to prescribe an antibiotic for an anaerobic infection; physicians must prescribe antibiotics based on what they believe is the most likely organism present. Those organisms include staph or strep, which are both covered by Levaquin. It was not appropriate to prophylactically prescribe for every bacteria that could potentially cause an infection. That is why patients are to follow up with primary care physicians, as it gives the physicians a chance to determine whether the infection is responding and to change the antibiotic if it is not.

Dr. Zun further testified that it did not violate the standard of care during Leonard's first visit to discharge him without ordering a complete blood count or an X-ray as neither is

9

indicated for routine cellulitis. Even if a complete blood count and X-ray had been ordered during the first emergency room visit and both revealed the same results as the tests during the second emergency room visit, those results would not have changed the course of action prescribed by Dr. Veguilla.

Dr. Zun opined that hospitalization was not required following either emergency room visit as the records indicated that the first visit involved a straightforward cellulitis and lymphangitis case and, by the second visit, Leonard's condition had improved as evinced by the disappearance of the red streaks and the lack of fever. Furthermore, the pus draining from the wound was an indication that the infection was actually improving, not getting worse. After pus drains, an infection usually improves so the appearance of pus was not a sign that the antibiotics should have been changed. The slightly elevated white blood cell count indicated that Leonard's body could mount an appropriate response to the infection, given the fact that his body was producing white blood cells to respond to the infection. In Dr. Zun's opinion, none of the test results suggested that the antibiotics should have been changed.

Finally, Dr. Zun testified that it is common for a patient to present with an improving infection, such as Leonard did on December 30, 2003, then experience a rapid deterioration thereafter. Had Leonard presented on December 30 with any of the

10

indications that were present on January 2, 2004 (color of the toes had changed, with ischemic changes and foul odor), then admission would have been indicated.  However, the medical records reveal that those symptoms were simply not present during Leonard's December 30, 2003, visit.

Defendants also called Dr. Fred Zar to testify on their behalf.  Dr. Zar is an infectious disease expert.  His testimony was very similar to Dr. Zun's.  He testified that Levaquin was a proper antibiotic to prescribe to Leonard and that there was no indication to change that course of treatment.  Given Leonard's symptoms, there was no need for an infectious disease consultation during either of his emergency room visits.  He agreed that physicians are not to prescribe antibiotics for every infection a patient may possibly get, but rather are only to prescribe medications based upon the condition observed.

Dr. Zar opined that the presence of pus on the December 30 visit did not indicate that the infection was worsening but, rather, that the infection was getting better.  Another sign that the infection was improving on that date, was the fact the lymphangitis was no longer present.  Based on these findings, it was reasonable for Dr. Zwolski to continue the Levaquin and conclude that it was adequately covering Leonard's infection. Dr. Zar opined that a new bacteria, resistant to the Levaquin, may have entered through the wound opening and caused the rapid

11

deterioration that occurred by January 2, 2004. In his opinion, Leonard's amputation was due, in part, to vascular disease resulting from diabetes and not only due to the infection. A test taken at Northwestern Memorial confirmed that Leonard had severe small vessel disease. Leonard's small blood vessels had been damaged from years of diabetes. This inhibited circulation of his own antibodies, as well as antibiotics. Dr. Zar testified that once the infection occurred, amputation was virtually inevitable due to the severe vascular disease.

After trial, the jury returned a verdict for the defendants and against plaintiffs. The circuit court denied plaintiffs' posttrial motion for judgment notwithstanding the verdict (judgement *n.o.v.*) or, in the alternative, for a new trial. This timely appeal followed.

ANALYSIS

Plaintiffs argue on appeal that the trial court erred in denying their posttrial motion. The motion alleged that the "overwhelming evidence presented during this trial clearly established that the plaintiffs met their burden of proof and unequivocally proved [defendants] were negligent." The posttrial motion further alleged that the trial court erred by denying their motion *in limine* and allowing testimony that both defendant physicians served in the armed services, claiming such testimony severely prejudiced the plaintiffs.

12

I. Judgment *n.o.v.*

We review a trial court's ruling on a motion for judgment notwithstanding the verdict (judgment *n.o.v.*) *de novo*. *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill. 2d 102 (1999). A judgment *n.o.v.* should only be entered when all the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494 (1967).

In an appeal from a jury verdict, a reviewing court may not reweigh the evidence and substitute its judgment for that of the jury. *Snelson v. Kamm*, 204 Ill. 2d 1 (2003). It is within the jury's province to resolve conflicts in evidence, pass on the credibility of witnesses, and determine the weight given to witnesses' testimony. *Canopy v. Hentz*, 345 Ill. App. 3d 797 (2004).

Plaintiffs argue that the "overwhelming evidence presented during this trial clearly establishes that the plaintiffs met their burden of proof and unequivocally proved that Dr. Vegulla and Dr. Zowlski were negligent in one or more ways." This is so, plaintiffs conclude, because central to the issue of deviation from the standard of care was the choice of the antibiotic Levaquin. Plaintiffs claim that since all four of the parties' retained experts testified that Levaquin provided no anaerobic

13

coverage, they unequivocally proved defendants violated the applicable standard of care given Leonard's status as a diabetic and transplant patient.  Therefore, plaintiffs assert, the jury's verdict to the contrary was against the manifest weight of the evidence.

Dr. Rosenberg, plaintiffs' emergency room standard of care expert, testified that defendants violated the applicable standard of care by not prescribing a broader based antibiotic that would cover anaerobic bacteria.  Dr. Rosenberg further testified that the emergency room physicians violated the applicable standard of care by not admitting Leonard to the hospital on either his first or second visit to the emergency room.  This testimony was clearly contradicted.

Defendants' experts, Drs. Zun and Zar, opined that defendants did nothing wrong in the course of care they prescribed Leonoard.  Dr. Zun, as well as Dr. Rosenburg, testified that the prescription of Levaquin was appropriate given Leonard's symptoms which indicated routine cellulitis and lymphangitis.  Dr. Zun stated that failing to admit Leonard to the hospital, or prescribe a broader based antibiotic that would cover anaerobic bacteria, was not a violation of the standard of care.  This was so for many reasons according to Dr. Zun.

Defense experts testified that physicians are only to treat the symptoms and conditions presented and only prescribe antibi-

14

otics for the most likely organism present.  They stated it is totally inappropriate to prescribe medications prophylactically for every bacteria that could possibly cause an infection.

Defendants' experts continued by noting that all indications pointed to the conclusion that the Levaquin was working.  This was so given Leonard's condition when he presented for the second time to the emergency room.  Leonard's own trial testimony confirms that the "streaks had gone down" (the lymphangitis) from the first visit to the second visit.  When asked whether there was a foul smell to his foot when he presented to the emergency room the second time, plaintiff admitted that "at that time there wasn't, no."  Plaintiff acknowledged that he had no fever and that there was no additional redness in his foot when he presented to the emergency the second time.

Dr. Zun testified that those facts coupled with the blood test results and the draining pus (being a sign of healing) lead to the conclusion that the Levaquin was working.  Therefore, in Dr. Zun's opinion, continuing a course of treatment that appeared to be working did not violate the standard of care.

Moreover, plaintiffs' infectious disease expert, Dr. Segreti, testified that in his opinion, the only reason Leonard's foot was partially amputated was due to the infection.  This, too, was contradicted.  Dr. Zar, defendant's infectious disease expert, testified that the cause of the amputation was, in part,

15

due to Leonard's vascular disease problems associated with diabetes.  Dr. Zar noted that the Northwestern Memorial records confirmed that Leonard had severe small vessel disease.  This inhibited circulation of plaintiff's own antibodies as well as the antibiotics.  Dr. Zar concluded that once the infection occurred, amputation was virtually inevitable due to the severe peripheral vascular disease.

Clearly, the evidence does not so overwhelmingly favor the plaintiffs that the jury verdict cannot stand as only a contrary conclusion should have been reached.  The jury simply resolved disputed issues in defendants' favor.  We find no error in the trial court's denial of plaintiffs' posttrial motion for judgment *n.o.v.*

## II. Military Service

A trial court's ruling on a motion *in limine* addressing the admission of evidence will not be disturbed on review absent a clear abuse of discretion.  *Swick v. Liautaud*, 169 Ill. 2d 504, 521, 621 N.E.2d 1238 (1996).  An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view.  *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515 (1991).  The admission of evidence rests largely within the sound discretion of the trial court, and its decision will only be reversed when such discretion has been clearly abused.  *Hunt v Harrison*, 303 Ill. App. 3d

16

54, 707 N.E.2d 232 (1999). Plaintiffs claim the trial court abused that discretion regarding evidence of defendants' military service as: (1) Dr. Zwolski's deployment to the Iraq war was subsequent to his treatment of plaintiff; and (2) reference to the physicians' military service improperly influenced the jury by invoking "strong views of patriotism for our troops." Therefore, plaintiffs argue, such references were more prejudicial than probative.

In *Jones v. Rallos*, the court held that "'when a physician sued for malpractice testifies as an expert, evidence as to his age, practice, and like matters relating to his qualifications as an expert is admissible.'" *Jones v. Rallos*, 384 Ill. App. 3d 73, 90, 890 N.E.2d 1190, 1205-06 (2008), citing *Rockwood v. Singh*, 258 Ill. App. 3d 555, 557, 630 N.E.2d 873, 875 (1993). As such, the *Jones* court held it was not error to allow into evidence the fact that the defendant physician failed a board certification exam some 20 years before treating the patient. *Jones*, 258 Ill. App. 3d at 90.

Dr. Zwolski was deployed to Iraq to serve as a physician. Dr. Veguilla, while discussing his collegiate path from Lehigh University to Monmouth College, mentioned that between schools he "signed up for the Marine Corps." Then, "after [his] training in the Marine Corps," he continued college. Both defendants testified as experts on their own behalf claiming, in their expert

17

medical opinion given all their training and education, they did nothing wrong.  Certainly Dr. Zwolski's service in Iraq as a physician involved matters relating to his qualification as an expert.  The fact that Dr. Zwolski's service took place after treating Leonard is of no consequence.  All of Dr. Zwolski's medical experience is relevant to his qualification as an expert at trial.  Moreover, we cannot say the references to either Dr. Veguilla's time in the military or Dr. Zwolski's service in Iraq was more prejudicial than probative.

During opening statements, defense counsel briefly mentioned Dr. Veguilla's military service and the fact that Dr. Zwolski was a member of the United States Navy Reserves.  During defendants' direct testimony, each doctor was allowed to testify to the nature and timing of their military service and where it fell in relation to other professional and educational training.  Then, in closing, defense counsel briefly mentioned Dr. Zwolski's treatment of soldiers in Iraq, but did not mention Dr. Veguilla's service whatsoever.  The evidence did no more than give the jurors some background on these defendants.  The evidence was relevant as to Dr. Zwolski's credentials as an expert physician. While less relevant as to Dr. Veguilla, any error was harmless. No undue attention was paid to Dr. Veguilla's military service.

We find it was not an abuse of discretion to deny plain-tiffs' motion *in limine* and allow references to defendants'

18

military service.  The trial court did not err in denying plaintiffs' posttrial motion for a new trial.  Any error as to Dr. Veguilla's service was harmless.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

Affirmed.

CARTER and LYTTON, JJ., concur.